**NORTH ATLANTIC INSTRUMENTS, INC., Plaintiff–Counter– Defendant–Appellee,**

v.

**Fred HABER and Apex Signal Corp., Defendants–Counter–Claimants– Appellants.**

**Docket No. 98–9423**

United States Court of Appeals, Second Circuit.

Argued: May 26, 1999.

Decided: Aug. 9, 1999.

Thomas L. Costa, Law Offices of Thomas L. Costa, LLP, Melville, N.Y. (Robert L. Folks, Steven M. Lester, and Bryan C. Van Cott, of counsel), for Defendants–Counter–Claimants–Appellants.

Erica B. Garay, Rivkin, Radler & Kremer, Uniondale, N.Y. (Evan H. Krinick and Michael P. Versichelli, of counsel), for Plaintiff–Counter–Defendant–Appellee.

Before: VAN GRAAFEILAND, CALABRESI, and STRAUB, Circuit Judges.

Judge VAN GRAAFEILAND dissents in a separate opinion.

STRAUB, Circuit Judge:

The defendants-appellants, Fred Haber and Apex Signal Corp., appeal from an order of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) preliminarily enjoining them from, *inter alia*, soliciting particular client contacts contained in a list allegedly misappropriated from the plaintiff-appellee, North Atlantic Instruments, Inc. In support of its decision, the District Court relied in large part on findings of fact and conclusions of law presented in a Report and Recommendation by the Magistrate Judge (Michael L. Orenstein, *Magistrate Judge*), who had held an extensive, eight-day evidentiary hearing. Based on the Report and Recommendation and its own review of the record, the District Court concluded, *inter alia*, that the list of client contacts prepared and used by Haber while Haber was an employee of North Atlantic constituted a protectable trade secret and that the defendants were bound not to use the information contained in the list. In light of those findings and the Magistrate Judge's determination that any misappro-priation of North Atlantic's trade secrets would cause the company irreparable damage, the District Court entered a preliminary injunction against the defendants.

This appeal requires us to decide whether the District Court permissibly restricted the defendants from soliciting North Atlantic's customers through the individual client contacts that Haber had developed while at North Atlantic and its predecessor. Because we conclude that the District Court did not exceed its allowable discretion in doing so, we affirm.

## BACKGROUND

On August 31, 1994, North Atlantic entered into an Asset Purchase Agreement with Transmagnetics, Inc. ("TMI"). North Atlantic designs and manufactures specialized, technical, industrial electronics equipment utilized in the development and testing of systems used on ships, tanks, and commercial and military aircraft. In 1994, TMI was engaged in a related business targeted towards a particular niche market: It designed, manufactured, and sold customized electronic devices to a limited number of engineers, also in the aerospace and high tech industries. At the time North Atlantic acquired TMI, Haber was a one-third owner of TMI, its president, and the head of sales—a position which allowed him to develop extensive client contacts.

North Atlantic's chief executive testified that the specialized and customized nature of TMI's business made the identity of the relatively small numbers of engineers who required its products especially crucial to its business success. That is, there may be only two engineers—within a company comprised of 20,000 engineers and 100,000 employees—who might need the technology produced by TMI. As a result, he concluded, knowing the identity and needs of these engineers was an extremely valuable aspect of TMI's business and one that would have been very difficult for any company to derive on its own. In part because of this, North Atlantic evidently conditioned its purchase of TMI on Ha-

ber's continuing to work for North Atlantic in a similar role to that which he had occupied at TMI.

The Asset Purchase Agreement provided that TMI would sell and transfer to North Atlantic "all of the properties and assets of every kind, nature and description, real, personal or mixed, tangible or intangible." Specifically itemized within these assets were "[a]ll ... customer and vendor data bases" and "[a]ll goodwill and other intangible assets, owned, used or held for use by [TMI]" in its business. Consistent with this language, North Atlantic's owner testified that the list of client contacts presumably included within these intangible assets was "a very important aspect of the purchase." North Atlantic paid $99,667 for TMI's fixed assets, a portion of which included goodwill, and $851,134 for TMI's inventory. In addition, North Atlantic clearly valued the information that Haber brought to bear, as demonstrated by its paying him salary and bonuses of approximately $300,000 in his first year with North Atlantic.

Shortly after the acquisition, on November 7, 1994, North Atlantic entered into an employment agreement (the "Employment Agreement") with Haber. Its original term was twenty-one months, and the parties later extended it to continue to July 31, 1997. The Employment Agreement acknowledged that North Atlantic "is engaged in specialized businesses ... and the information, research and marketing data developed by [North Atlantic] or any affiliate are confidential." In it, Haber expressly agreed:

> to keep secret and retain in the strictest confidence all confidential matters which relate to [North Atlantic], including, without limitation, customer lists, trade secrets, pricing policies and other confidential business affairs of [North Atlan-

tic] ... and any affiliate ... and not to disclose any such confidential matter to anyone outside [North Atlantic] or any affiliate.... [1]

The terms of this provision apply both "during and after his period of service with [North Atlantic]," and the agreement required that Haber turn over, upon his termination, all documents and property of North Atlantic that contained any confidential information.[2] Haber acknowledged in the Employment Agreement that an injunction would be a permissible remedy for a material breach of the confidentiality provision because such a breach would cause "irreparable injury to [North Atlantic] and ... money damages [would] not provide an adequate remedy to [North Atlantic]." Finally, the Employment Agreement contained a merger clause, which stated that the contract represented the "full and complete agreement of the parties relating to the employment of [Haber]."

After the acquisition, TMI became a division of North Atlantic with Haber as its president and, for the first six months, as its engineering manager. While he occupied these positions, Haber had access to information about North Atlantic's technology and customer base, including lists of customers and contacts with their individual product needs. Specifically, information on each client of North Atlantic's TMI division was centralized in a customer database program, accessible to Haber and a handful of other North Atlantic employees from both desktop and laptop computers. The client information contained in the database included company names, contact names, phone and fax numbers, and more particularized information relating to the specific clients' needs and purchases.

In July 1997, Haber left North Atlantic to join Apex Signal Corp., a company that

---

1. The Employment Agreement excluded from its definition of "Confidential Information" that which has become public knowledge independently of any wrongful acts by Haber.

2. As explained below, North Atlantic took additional steps with Haber and its other employees to protect against the disclosure of trade secrets, including additional confidentiality agreements.

manufactures products targeting the same niche market as North Atlantic's TMI division. North Atlantic argues that after Haber joined Apex, Apex changed its focus from more general purpose products to the customized products produced by TMI and later by North Atlantic's TMI division. In doing so, North Atlantic asserts, Apex began to target North Atlantic's customer base. Apex contends that it had developed the technology earlier and hired Haber only when it had reached the stage when it could begin marketing the product. In either case, as soon as Haber left North Atlantic and began work for Apex, he began calling the client contacts he had used and developed while at North Atlantic and TMI, and asking that they leave North Atlantic to do business with Apex. In so doing, he offered them replacement products for products he had sold them while at North Atlantic or TMI. Indeed, Apex hired Haber specifically because his years in the business and the contacts that he had developed over those years would assist Apex in marketing its product.

In addition, at the hearing before the Magistrate Judge, North Atlantic produced a printout of confidential client information from North Atlantic's customer database, printed by Haber on September 5, 1997—over one month after he had left North Atlantic—and found in Apex's files.[3] Haber had no explanation for how or why he would have had access to or would have been able to print that information at that time, because he had purported to delete or return to North Atlantic all of his confidential client information upon changing jobs.[4] Testimony at the hearing suggested that it would have been impossible for Haber to have generated this information unless he had taken files with him when he

left North Atlantic. Finally, evidence at the hearing indicated that Haber had in other instances used his contacts and product and pricing information from his time at North Atlantic to solicit customers for Apex.

North Atlantic filed its complaint on November 6, 1997, alleging numerous violations of state and federal law, including § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Specifically, North Atlantic asserted, *inter alia*, that Haber and Apex engaged in unfair competition, misappropriated confidential business information, and misused trade secrets and proprietary information. In addition, the complaint alleged that Haber breached his employment agreement and implied covenant not to damage the goodwill North Atlantic acquired in its acquisition of TMI.

Also on November 6, 1997, North Atlantic moved for a temporary restraining order and preliminary injunction, seeking to enjoin Haber and Apex from misappropriating or disclosing any confidential proprietary information relating to North Atlantic's business and soliciting any customers of North Atlantic. The District Court granted a temporary restraining order and referred the motion to a Magistrate Judge. After a series of hearings in December 1997, the Magistrate Judge recommended granting the preliminary injunction in most respects and issued a Report and Recommendation to that effect on March 27, 1998. Both parties filed objections to the Report and Recommendation, and Haber and Apex filed a motion to dismiss the complaint. The District Court adopted the Report and Recommendation in all material respects and denied the motion to dismiss in an extensive written but unpublished opinion.

---

**3.** Haber clearly used the information on the day he printed the file: That day, he sent a fax to the contact listed on the form.

**4.** Haber left his desktop computer at North Atlantic, and a systems person from North Atlantic cleared Haber's laptop computer of any North Atlantic files; indeed, North Atlantic's chief executive checked the computer

before returning it to Haber. North Atlantic did not recall at that time, however, that Haber also still owned another, slightly outdated, laptop computer, which he had used before North Atlantic replaced it with a newer version; North Atlantic did not delete files on the earlier machine.

The District Court's opinion "inter-pret[ed] the Report and Recommendation as barring the use of trade secrets by the defendants, including soliciting the contact person of a customer, even when seeking bids for new projects or in any connection with new projects, or even after being solicited by customers." The District Court adopted this central holding of the Report and Recommendation. In doing so, it accepted the concept that Haber and Apex may approach and solicit the client companies as customers, but that they may not use Haber's individual contacts—which are trade secrets—to do so. The District Court also adopted the Magistrate Judge's determination that Haber and Apex may not solicit the individual contacts even if Haber and Apex could acquire the contact information through independent means. The District Court explained: "[A]fter being made aware of the identities of the specific contact persons through Haber, the defendants cannot now feign ignorance of this information...." The District Court also approved the Magistrate Judge's decision not to consider extrinsic evidence that Haber had specifically nego-tiated non-compete and non-solicitation clauses out of his employment agreement.

The District Court went on to accept the limitations on the injunction and to strike a paragraph that it deemed confusing and repetitive; these rulings are not at issue on this appeal. Likewise, the District Court reviewed and denied the defendants' motion to dismiss—a decision that is also not before us on appeal.

Haber and Apex appear to accept much of the preliminary injunction and now ap-peal only the portion of the District Court's order forbidding Haber and Apex from soliciting the contacts Haber devel-oped while at North Atlantic and TMI.

## DISCUSSION

### I. *Applicable Standards*

■ "A party seeking a preliminary injunction must establish that 1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hard-ships tips decidedly in favor of the moving party." *Otokoyama Co. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir. 1999); *accord Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997). A district court's issuance of an injunction is reviewed for an abuse of dis-cretion. *See Otokoyama,* 175 F.3d at 270; *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d Cir.1995). "Such an abuse of discretion typically consists of either ap-plying incorrect legal standards or relying on clearly erroneous findings of fact." *Shapiro,* 51 F.3d at 332 (internal quotation marks omitted). The District Court had supplemental jurisdiction over North At-lantic's state law claims on which it based the issuance of the injunction. Under New York's choice of law rules, *see Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir. 1989) (a federal court adjudicating a sup-plemental state law claim applies the choice of law rules of the forum state), New York law properly applies to this case in which all of the parties are based in New York and the relevant contracts and transactions appear to have been executed and occurred in New York. *See Lazard Freres & Co. v. Protective Life Ins., Co.,* 108 F.3d 1531, 1539 (2d Cir.) (New York applies the law of the state having the most significant contacts to the underlying transaction), *cert. denied,* — U.S. —, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997).

We first consider whether, under New York law, North Atlantic has established a likelihood of success on the merits.

### II. *Likelihood of Success on the Mer-its*

■ To succeed on a claim for the mis-appropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2)

that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *See Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993) (citing *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990)).

## A. *North Atlantic's Client Contacts as Trade Secrets*

We first consider whether the District Court properly concluded that North Atlantic's client list, which contains the identities and preferences of its client contacts, constitutes a protectable trade secret. As explained below, we hold that the District Court did not exceed its allowable discretion in determining that it does.

■ "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir.1997) (quoting Restatement of Torts § 757 cmt. b (1939)), *cert. denied,* —— U.S. ——, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *accord Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 1012–13, 604 N.Y.S.2d 912, 917–18 (1993) (quoting the Restatement). In determining whether information constitutes a trade secret, New York courts have considered the following factors:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be

properly acquired or duplicated by others.

*Ashland Management,* 82 N.Y.2d at 407, 624 N.E.2d at 1013, 604 N.Y.S.2d at 918 (quoting Restatement of Torts § 757 cmt. b) (internal quotation marks and brackets omitted); *accord Hudson Hotels Corp.,* 995 F.2d at 1176 n. 1; *Integrated Cash Management Servs.,* 920 F.2d at 173.

■ "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.,* 759 F.2d 1053, 1063 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *accord Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392–93, 278 N.E.2d 636, 640, 328 N.Y.S.2d 423, 428 (1972). "The question of whether or not a customer list is a trade secret is generally a question of fact." *A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 89 (2d Cir.1991); *see also Chevron U.S.A. Inc. v. Roxen Serv., Inc.,* 813 F.2d 26, 29 (2d Cir.1987); *Ashland Management,* 82 N.Y.2d at 407, 624 N.E.2d at 1013, 604 N.Y.S.2d at 918. As explained below, the Magistrate Judge's factual determination—which the District Court adopted—exhaustively considered the relevant factors as laid out by the Restatement and concluded that the list of client contacts was a protectable trade secret. This finding was not clearly erroneous.

The Magistrate Judge concluded that the list of *companies* to whom North Atlantic's TMI division sold was not a trade secret. In this respect, the Magistrate Judge found that North Atlantic had not proven that such a list "could not have been developed by reviewing, among other public sources, trade publications available to anyone who availed himself or herself [of] such reference." He further noted that "[i]mportantly, the TMI catalog[,

which is a public document,] contained a list of its primary customers and the military projects in which TMI products were used." By contrast, the Magistrate Judge determined that the *identities of individual contact people* with whom Haber dealt while at North Atlantic or TMI were protectable trade secrets.

The Magistrate Judge began his analysis for this second conclusion by determining that information on specific contact people was "not readily available" to others in the industry. That is, Haber generated the list of specific contact people—the people who required the customized technology produced by TMI and North Atlantic's TMI division—over the fifty years he had worked in the industry, more than half of which he spent at TMI. The Magistrate Judge relied in his finding on the testimony of North Atlantic's chief executive, who described the needle-in-the-haystack character of the search for the handful of engineers in companies of 100,000 employees who might have a use for one of North Atlantic's customized products.

The Magistrate Judge went on to consider the third Restatement factor, concluding that North Atlantic took numerous appropriate measures to prevent unauthorized disclosure of the information contained in its list of client contacts. In his analysis, the Magistrate Judge looked to several confidentiality agreements signed or agreed to by Haber and other North Atlantic employees. Most pertinently, the Employment Agreement itself contains an express non-disclosure provision requiring that Haber "keep secret and retain in the strictest confidence all confidential matters which relate to [North Atlantic], in-

cluding, without limitation, customer lists [and] trade secrets." Second, the Magistrate Judge noted that all North Atlantic employees, including Haber, signed a more general confidentiality provision in an Employee's Handbook.[5] Third, the Magistrate Judge pointed to a separate employee confidentiality agreement that recognizes that an employee's services at North Atlantic will "expose [the employee] to ... information or data with respect to ... lists of actual and prospective customers." Accordingly, the employee "agree[s] to keep secret all such confidential matters [and] ... further acknowledge[s] and agree[s] that all such information and materials constitute trade secrets of [North Atlantic]."[6] Fourth, a similar confidentiality agreement existed during Haber's years as president of TMI requiring that employees not "divulge ... any information which has come into [their] possession as a result of [their] employment with [TMI] to any third parties, *including ... customer lists.*" (emphasis added). Finally, the Magistrate Judge noted that North Atlantic's "computers require each user to input a password in order to gain access to the system and, upon entry, a [confidentiality] warning message is displayed." Indeed, access to the database containing the list of client contacts was restricted to only seven or eight employees out of seventy on a "need to know" basis. In light of this analysis, the Magistrate Judge concluded that North Atlantic had taken sufficient measures to safeguard the confidentiality of its client contact list.

The Magistrate Judge next assessed the value of the list of client contacts and the energy and effort necessary to create it.

---

**5.** The Employee's Handbook dictated, *inter alia*, that all employees must "respect and maintain the confidentiality" of sensitive "technical and non-technical" information to which they have access. The handbook provided further that "[t]his confidentiality must continue past [the employee's] active employment relationship with North Atlantic." While the Employee's Handbook does not define what "technical and non-technical information" employees must keep confidential, it

supports the notion that North Atlantic generally took the issue of confidentiality seriously.

**6.** There is no evidence in the record that Haber signed this agreement although, here again, this is not directly relevant to the inquiry of whether North Atlantic generally took measures to guard the secrecy of its confidential information, including its list of client contacts.

In this respect, he pointed to testimony by North Atlantic's chief executive stating that "[i]n the technology business, the most expensive thing to replicate is your relationship with your customers. That's the value of a company, the collective relationships and good will and reputation that you have garnered in the industry." Additionally, the Magistrate Judge noted that North Atlantic had paid for TMI's assets, including intangible goodwill.

Finally, the Magistrate Judge concluded that the client contact list assembled over Haber's years at TMI and North Atlantic's TMI division could probably be duplicated, but only "with great difficulty." Moreover, the Magistrate Judge determined that regardless of whether Apex *could* generate the list on its own, it did not: Rather, "[t]he only basis for [Apex's] knowledge of the customer information is from Haber's direct exposure to the information resulting from his employment relationship with TMI and [North Atlantic]."

We hold that the District Court did not clearly err in adopting the Magistrate Judge's extensive and detailed factual determination that the identity of North Atlantic's client contacts was a protectable trade secret. Numerous cases applying New York law have held that where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply. *See, e.g., FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984) (per curiam) (reversing as clearly erroneous a district court's finding that a customer list was not a trade secret where it would have been difficult to find clients without the employee's help); *Webcraft Techs., Inc. v. McCaw*, 674 F.Supp. 1039, 1044 (S.D.N.Y. 1987) (Leval, *J.*) (protecting as a trade secret a customer list that took great time and effort to compile, including "development of a specialized knowledge of the customer's operations and needs"); *Nut-*

*meg Techs., Inc. v. Mahshie*, 12 U.S.P.Q.2d 1469, 1472, 1989 WL 60285, at **5–6 (N.D.N.Y. June 6, 1989) (holding that a customer list whose "customers are only cultivated after extensive efforts by [the plaintiff]" was a trade secret); *Giffords Oil Co. v. Wild*, 106 A.D.2d 610, 611–12, 483 N.Y.S.2d 104, 106 (2d Dep't 1984) (holding that a customer list that required substantial time and money to compile and that contained information "which could only be achieved through personal solicitation" was a protectable trade secret); *see also Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392–93, 278 N.E.2d 636, 640, 328 N.Y.S.2d 423, 428 (1972) ("[W]here the customers are not known in the trade or are discoverable only by extraordinary efforts courts have not hesitated to protect customer lists and files as trade secrets. This is especially so where the customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money."). At least one very recent New York appellate case concluded that a customer list was a trade secret and upheld an injunction "prohibit[ing] the defendants from contacting or soliciting those customers of the plaintiffs who previously were served by the . . . defendants when they were employed by the plaintiffs." *Laro Maintenance Corp. v. Culkin*, 681 N.Y.S.2d 79, 80, 255 A.D.2d 560, 560 (2d Dep't 1998).

*Leo Silfen, Inc. v. Cream* does suggest that one factor in analyzing a trade secret claim against an employee who has solicited a former employer's customers is whether the solicitation was merely "the product of casual memory." 29 N.Y.2d at 391, 278 N.E.2d at 639, 328 N.Y.S.2d at 427. While it is true that Haber likely could remember his contacts at some of the companies that North Atlantic targets, we do not read *Leo Silfen* to describe a broad rule dictating that anything an employee remembers casually is not a trade secret.[7] Rather, *Leo Silfen*

---

**7.** We note that such a rule would almost surely prove unworkable in situations where, as here, there is evidence that although the employee may have committed some informa-

expressly notes that customer lists, such as this one, in which customers are not readily ascertainable and in which patronage has been secured only through the expenditure of considerable time and money, are protectable trade secrets. *See* 29 N.Y.2d at 392–93, 278 N.E.2d at 639–40, 328 N.Y.S.2d at 428; *accord Webcraft Techs.*, 674 F.Supp. at 1045; *cf.* 4 Roger M. Milgrim, Milgrim on Trade Secrets, App. 15A–3 (1998) ("[T]he majority rule is ... that appropriation by memory will be restrained under the same circumstances as will appropriation by written list."). Moreover, *Leo Silfen* implies that its holding is limited to cases lacking an express confidentiality agreement protecting customer lists—a clear distinction from the instant case. *See* 29 N.Y.2d at 395, 278 N.E.2d at 641, 328 N.Y.S.2d at 430.

Finally, *Leo Silfen* explains that if a defendant's solicitation followed "a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service." 29 N.Y.2d at 391–92, 278 N.E.2d at 639, 328 N.Y.S.2d at 427. This may well be such a case in light of the unrefuted evidence that Haber printed and used information from North Atlantic's client database after the date on which he had purported to return or destroy all such material. We need not decide that question, however, because the District Court's finding that North Atlantic's list of client contacts was a trade secret stands on its own.

The Magistrate Judge's findings with regard to the time and effort required to create the list of client contacts, as well as the lack of the general availability of such customer information to others in the trade, are amply supported in the record. Likewise, the record buttresses the Magistrate Judge's determination that North

Atlantic made clear the importance of maintaining the confidentiality of the client contact list both to its employees generally and to Haber in particular. In light of the care with which North Atlantic guarded this information and the plain terms of the Employment Agreement, it would be difficult to conclude that Haber was unable to discern his responsibilities with respect to his client contact list. Particularly given the deference due a district court in determining the appropriateness of a preliminary injunction, we cannot hold that, in this case, the adoption of the Magistrate Judge's Report and Recommendation on this point was clearly erroneous.

**B. *Use of the Client List in Breach of a Duty***

■ We next consider whether the defendants' use of a trade secret—specifically the list of client contacts—was in breach of a duty. As explained below, New York law imposes a duty not to use trade secrets in competition with a former employer, and the Employment Agreement clearly reinforces this duty, requiring that Haber keep all trade secrets and client lists strictly confidential. Accordingly, we affirm on this point and therefore affirm the District Court's determination that North Atlantic has demonstrated a sufficient likelihood of success on the merits of its misappropriation of trade secrets claim.

■ Both this Circuit and numerous New York courts have held "that an agent has a duty 'not to use confidential knowledge acquired in his employment in competition with his principal.'" *ABKCO Music Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir.1983) (quoting *Byrne v. Barrett*, 268 N.Y. 199, 206, 197 N.E. 217, 218 (1935)). Such a duty "exists as well after the employment is terminated as during its continuance." *Id.* (internal quotation marks omitted); *accord L.M. Rabi-*

---

tion to memory, he also physically took other information. The task of crafting an injunction permitting use of casually remembered

information, while prohibiting the use of a list that the employee physically pilfered, would be virtually impossible as a practical matter.

*nowitz & Co. v. Dasher*, 82 N.Y.S.2d 431, 435 (Sup.Ct.1948) ("It is implied in every contract of employment that the employee will hold sacred any trade secrets or other confidential information which he acquires in the course of his employment. This is a duty that the employee assumes not only during his employment but after its termination.") (internal citations omitted). Despite this implied duty, it is of course possible for an employer and employee to agree by contract to limit this duty. As explained below, however, Haber and North Atlantic did not do so in this case: Indeed, the Employment Agreement provided expressly that Haber had a comparable duty to maintain the confidentiality of TMI's and North Atlantic's trade secrets.

Haber's Employment Agreement requires that he "keep secret and retain in the strictest confidence all confidential matters which relate to [North Atlantic], including, without limitation, customer lists, trade secrets, pricing policies and other confidential business affairs of [North Atlantic] ... and any affiliate." The agreement also prohibits him from "disclos[ing] any such confidential matter to anyone." The Employment Agreement contains no limitation on its duration; rather it applies both "during [and] after his period of service with [North Atlantic]." In this way, it makes explicit an employee's implied duties under New York law with respect to confidential information.

Based upon the facts in the record, it is clear that Haber violated the duties imposed both by the Employment Agreement and by New York's laws. That is, the requirement that he "keep and retain [customer lists and trade secrets] in the strictest confidence" by its very terms precludes his using that confidential information for the benefit of a competitor business. Furthermore, common sense dictates the conclusion that the customer lists to which the Employment Agreement refers must encompass the list of client contacts at issue on this appeal. Particularly in light of the duty imposed by New York law not to use trade secrets in competition with a former employer, it is clear here that the use of the list of client contacts was in violation of a duty.[8]

The defendants contend that the Employment Agreement does not control in this case. This is so, they allege, because evidence surrounding the Employment Agreement's formation suggests that the parties contemplated Haber's being able to solicit clients upon his leaving North Atlantic. Regardless of what such parol evidence might suggest, we may not consider it because the agreement is unambiguous on its face and because the agreement contains a valid general merger clause. *See, e.g., Primex Int'l Corp. v. Wal–Mart Stores, Inc.*, 89 N.Y.2d 594, 599, 679 N.E.2d 624, 627, 657 N.Y.S.2d 385, 388 (1997) (noting that a general merger clause "require[s] full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing"); *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 659 (2d Cir.1996) (applying New York's parol evidence rule). Likewise, the defendants contend that the Asset Purchase Agreement provides a more limited duty of non-solicitation for Haber than that imposed by the preliminary injunction. We hold, however, that the Employment Agreement is clear on its face as to Haber's duties with respect to trade secrets and that nothing in the Asset Purchase Agreement contradicts it on this point.

---

8. Even if the defendants were to argue that Haber did not breach his duty to "keep secret and retain [trade secrets] in the strictest confidence" because Haber merely *used* rather than disclosed confidential information that he acquired at North Atlantic, such an argument would fail. Even if we did not conclude that Haber's use violated the express terms of the Employment Agreement, we could surely not accept that the Employment Agreement was explicit enough to displace Haber's duty at common law not to use trade secrets against his former employer.

Thus, the Employment Agreement reinforces Haber's duty under New York law not to use his former employer's trade secrets against the employer. Accordingly, the District Court properly concluded that North Atlantic has demonstrated a likelihood of success on the merits of its misappropriation of trade secrets claim.

### III. *Irreparable Harm*

 Finally, we conclude that North Atlantic has shown that it will suffer irreparable harm in the absence of an injunction. We have held that "loss of trade secrets cannot be measured in money damages" because "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984) (per curiam). In addition, Haber acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause "irreparable injury" to North Atlantic. *Cf. Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir.1999) (relying on a similar clause in determining irreparable injury for purposes of upholding a grant of injunctive relief). In light of our holding in *FMC* and the "irreparable injury" clause in the Employment Agreement, we conclude that North Atlantic would be irreparably harmed in the absence of an injunction.

### CONCLUSION

Because North Atlantic has demonstrated a likelihood of success on the merits and because it would suffer irreparable harm in the absence of an injunction, we conclude that the District Court did not exceed its allowable discretion in granting a preliminary injunction. We therefore affirm.

VAN GRAAFEILAND, Circuit Judge, dissenting:

Perhaps the best approach in deciding the legality of an order is to determine exactly what the order says. This is particularly true where disobedience of the order is punishable as a contempt of court.

Every order granting an injunction must be specific in its terms, Fed.R.Civ.P. 65(d). The party enjoined "must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Ass'n, Int'l.,* 473 F.2d 244, 247 (2d Cir.1972). "Basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." *International Longshoremen's Ass'n. Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). For these reasons, so-called "obey the law" injunctions cannot be sustained. *See Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 125–26, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *American Red Cross v. Palm Beach Blood Bank, Inc.,* 143 F.3d 1407, 1412 (11th Cir.1998); *City of Mishawaka v. Am. Elec. Power Co., Inc.,* 616 F.2d 976, 991 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981); 11A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2955 (2d ed.1995).

When I examine the order in the instant case with the foregoing admonitions in mind, I am troubled with the very first sentence which enjoins the defendants "from using any of plaintiff's trade secrets or proprietary information." There is no clear and readily understandable definition of the term "trade secret." *See Ashland Management, Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993). In determining whether a trade secret exists, the New York courts have considered the following factors to be relevant:

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting RESTATEMENT OF TORTS § 757 cmt.b).

A defendant enjoined from using a "trade secret" thus is confronted with an obey-the-law injunction. He does not know precisely what he is forbidden from doing. To avoid contempt, he has to follow the same process as do the courts, with no assurance of reaching the same result. It follows that when as here there is any ambiguity about what constitutes a trade secret, we should not affirm an injunction order that forbids its "use." Indeed, the word "use" itself is troublesome. Ordinarily, a trade secret is violated by its disclosure, not its use. The two words are not synonymous. One may use information without disclosing it.

This brings us to the term "customer contact" as used in the injunction order. Plaintiff contends that its customer contacts were few in number, i.e., a mere "handful." However, Exhibit 18 in evidence contains a list of NAI's active customers as of November 17, 1997, and Exhibit 19 contains a list of customers "booked" as of that date. Both lists contain the names of NAI's customers and their "contacts." The almost 600 names in these contact lists are more than a mere "handful." It is true that some customers have only one or two "contacts." Figures for other customers vary as follows: 24, 13, 20, 8, 5, 10, 8, 8, 19, 7, 14, 10, 79, 14, 36, 25, 44, 30, 5, 6, 4, 11, 12, 10, 18, 8, 8, 7, 18, 19, 35, 9, 13, 15, 7, 14. The only way in which Haber and Apex could be assured of avoiding all of these "contacts" would be to go out of business—to discontinue building a "better mousetrap" than was being built by plaintiff. Obviously, therefore, the term "customer contacts" refers to only those with whom Haber was familiar. Moreover, this familiarity was not something that came into existence after Haber became an employee of NAI. Haber had strong business and personal relationships with these "contacts" before he entered into NAI's employ. Indeed, it was for the purpose of making the benefit of these relationships available to NAI that Haber was employed. *See S.W. Scott & Co. v. Scott*, 186 A.D. 518, 527, 174 N.Y.S. 583 (1919). However, a man who changes employers does not "wipe clean the slate of his memory." *Peerless Pattern Co. v. Pictorial Review Co.*, 147 A.D. 715, 717, 132 N.Y.S. 37 (1911).

Identification of customer contacts fall, therefore, within the scope of Haber's covenant not to compete. The issue of non-competition was addressed directly in the Asset Purchase Agreement covering NAI's purchase of TMI, which limited the ban on competition to a period of two years. The two-year period, during which Haber strictly complied with his promise not to compete, expired prior to the institution of this litigation. The law is clear that unlimited implied restrictions against competition arising out of the sale of goodwill are inapplicable where the parties specifically negotiate and expressly agree to impose a less onerous restriction. *See MGM Court Reporting Serv., Inc. v. Greenberg*, 74 N.Y.2d 691, 693, 543 N.Y.S.2d 376, 541 N.E.2d 405 (1989); *Goldome Corp. v. Wittig*, 221 A.D.2d 931, 933, 634 N.Y.S.2d 308 (1995); *Titus & Donnelly, Inc. v. Poto*, 205 A.D.2d 475, 614 N.Y.S.2d 10 (1994)(mem.); *Anchor Alloys, Inc. v. Non–Ferrous Processing Corp.*, 39 A.D.2d 504, 507, 336 N.Y.S.2d 944 (1972). Because an unrestricted implied covenant not to compete would be "neither limited by time nor subject to the test of reasonableness." *Chev-*

*ron U.S.A. Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir.1987), it is a far stretch to believe that the parties intended that Haber carry secretly to his grave the identity of NAI's pre–1977 customer contacts.

My colleagues see no need to discuss the foregoing issues. *See* n.7, *supra.* They rely instead upon Haber's November 7, 1994 Employment Agreement which they say is so clear and unambiguous as to preclude any oral clarification. In that contract Haber agreed to keep and retain in strictest confidence all NAI's confidential matters and not to "disclose" any such matter to anyone outside the Company. The contract does not preclude Haber from "using" this information. Although my colleagues apparently do not agree, the words "use" and "disclose" are not synonymous. A preliminary injunction which ignores this distinction should not be permitted to stand.