08-5126-cv
*Faiveley Transport Malmo AB v. Wabtec Corporation*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: February 9, 2009                                    Decided: March 9, 2009)

Docket No. 08-5126-cv

FAIVELEY TRANSPORT MALMO AB,

*Plaintiff-Appellee,*

v.

WABTEC CORPORATION,

*Defendant-Appellant.*

Before: CABRANES and WESLEY, *Circuit Judges*, and KORMAN, *District Judge*.[*]

Defendant-appellant Wabtec Corporation appeals from an order of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*), granting in part and denying in part plaintiff-appellee Faiveley Transport Malmo AB's application for a preliminary injunction. Finding that Wabtec had likely misappropriated certain of Faiveley's trade secrets concerning the manufacture of an air brake system, the District Court enjoined Wabtec from disclosing Faiveley's proprietary information to any third party and from entering into new contracts to sell the disputed air brake system or its parts. Because the record evidence does not support the conclusion, and the District Court did not find, that Faiveley would suffer irreparable harm in the absence of this relief, a preliminary injunction was not warranted.

Vacated and Remanded.

---

[*] The Honorable Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

A. JOHN P. MANCINI (Vanessa M. Biondo, Christine M. Hernandez, and Daniel B. Kirschner, *on the brief*), Mayer Brown LLP, New York, NY, *for Faiveley Transport Malmo AB.*

JAMES C. MARTIN (Daniel K. Winters, Reed Smith LLP, New York, NY, and Colin E. Wrabley, Reed Smith LLP. Pittsburgh, PA, *on the brief*), Reed Smith LLP, Pittsburgh, PA, *for Wabtec Corporation.*

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented in this case—whether a manufacturer who likely misappropriated trade secrets may be preliminarily enjoined from (a) entering into contracts that will cause it to use those trade secrets and (b) disseminating further those trade secrets—concerns a rarely celebrated but instantly recognizable feature of everyday life in New York City: subway brakes. To the parties in this case, subway brakes are known as "Brake Friction Cylinder Tread Break Units" ("BFC TBU"). For the rest of us, BFC TBU are "that loud squeaking, sparking braking system that so reliably stops the New York City Transit subway system." *In re Faiveley Transp. Malmo AB*, 522 F. Supp. 2d 639, 640 (S.D.N.Y. 2007) ("*Faiveley I*") (internal quotation marks omitted). Twenty-four hours a day and 365 days a year, the City's subway cars safely stop at 468 passenger stations—and, as any straphanger knows, many times in between—depositing riders of all classes and descriptions at homes, workplaces, ballparks, and every other destination imaginable. *See generally MacWade v. Kelly*, 460 F.3d 260, 264 (2d Cir. 2006) ("The New York City subway system . . . is an icon of the City's culture and history, an engine of its colossal economy, a subterranean repository of its art and music, and, most often, the place where millions of diverse New Yorkers and visitors stand elbow to elbow as they traverse the metropolis.").

The subway is an indelible feature of the City's culture. Its legend and lore fascinate locals and visitors alike. *See, e.g.*, Carrie Melago, *It's the Rail Thing: Subway Ride Record is Official*, N.Y. Daily

2

News, Aug. 8, 2007, at 24 (reporting that six alumni of Regis High School set a new world record for stopping at all 468 stations on a single fare: 24 hours, 54 minutes, and 3 seconds). A point of personal pride for many New Yorkers, the City's subterranean transit has appeared in song, on stage and screen. *See, e.g.*, Leonard Bernstein, *et al.*, "New York, New York," from *On the Town* ("New York, New York—a helluva town, / The Bronx is up but the Battery's down, / And the people ride in a hole in the ground; / New York, New York—It's a helluva town[!]"), as quoted in *The Oxford Dictionary of Humorous Quotations* 329 (Ned Sherrin, ed., 1995) (attributed to Betty Comden and Adolph Green, lyricists). The subway's rhythm and sound have also rumbled into the canon of American literature. *See, e.g.*, Tom Wolfe, *The Bonfire of the Vanities* 36 (Farrar Straus Giroux 1998) (1987) ("On the subway, the D train, heading for the Bronx, Kramer stood in the aisle holding on to a stainless-steel pole while the car bucked and lurched and screamed.").

Moving forward, our next stop is the trade secret dispute concerning the distinctive brakes used by the New York City subway system.

## BACKGROUND

During the 1970s, SAB Wabco—a corporate descendant of the Westinghouse Air Brake Company and the predecessor-in-interest to plaintiff-appellee Faiveley Transport Malmo AB ("Faiveley")—developed BFC TBU, a unique air brake system designed to stop trains quickly and smoothly, if not always quietly. The original patents for the BFC TBU have since expired.

In 1993, SAB Wabco entered into a license agreement ("the 1993 Agreement") with Wabco, then a sister company.[1] Pursuant to the 1993 Agreement, Wabco was authorized to use SAB Wabco "know-how"—including "manufacturing data, specifications, designs, plans, trade secrets" and other information, J.A. 37 (1993 Agreement)—as well as "Patents, Patent Applications, and New

---

[1] Wabco, like SAB Wabco, is a corporate descendant of the Westinghouse Air Brake Company.

Technology," *id.* at 38, to produce and market BFC TBU. The 1993 Agreement was originally scheduled to expire on December 31, 2003, but could be renewed annually for one-year terms after that time by agreement of the parties. Upon the expiration of the 1993 Agreement, Wabco was to "cease manufacture" of licensed products, except insofar as required to meet contracts entered into prior to the expiration of the agreement. *Id.* at 46.

In 2004, Faiveley acquired SAB Wabco. As part of the acquisition, Faiveley assumed ownership of SAB Wabco's intellectual property, including that related to BFC TBU, as well as SAB Wabco's rights and obligations under the 1993 Agreement. At that time, Wabtec Corporation ("Wabtec"), the successor-in-interest to Wabco, was still producing BFC TBU parts and components pursuant to the 1993 Agreement. In December 2004, Faiveley notified Wabtec that the 1993 Agreement would not be renewed, as a result of which the 1993 Agreement terminated on December 31, 2005.

Beginning in 2005, Wabtec began to develop its own line of BFC TBU through "reverse engineering." In 2007, the New York City Transit Authority (the "Transit Authority")[2] awarded a "sole source" contract to Wabtec whereby Wabtec was to provide BFC TBU for the City's overhaul

---

[2] The Transit Authority is a public benefit corporation whose principal business is the operation of public subways and buses within New York City. It was created by New York State in the early 1950s to consolidate the multiple subway and bus lines that operated more-or-less independently since the turn of the century. *See The Encyclopedia of New York City* 827 (Kenneth T. Jackson, ed., 1995); *see also Gilchrist v. Interborough Rapid Transit Co.*, 279 U.S. 159, 190-91 (1929) (summarizing, in a dispute over a proposed fare hike from five cents to seven cents, the early financing and development of New York City's subway system). We use in this opinion the Transit Authority's legal name, *see, e.g.*, *Transp. Workers Union, Local 100 v. N.Y. City Transit Auth.*, 505 F.3d 226 (2d Cir. 2007), but note that since the mid-1990s the agency has "branded" itself "M.T.A. New York City Transit." *See* James C. McKinley, Jr., *What's in a Symbol? A Lot, the M.T.A. Is Betting*, N.Y. Times, Aug. 28, 1994, at A31 ("Among the changes being made, the venerable Transit Authority, the subsidiary that runs the subways and most of the city's buses, becomes M.T.A. New York City Transit."). The "M.T.A." prefix refers to the Metropolitan Transportation Authority, a public benefit corporation created by the State of New York in 1968 to oversee the various transportation agencies serving New York City and its environs, including the Transit Authority. *See* Jackson, *supra*, at 758. According to what was once known as the "newspaper of record," the word "Authority" was dropped from the agency's public name "as a way to make the service[ ] a little more friendly." McKinley, *supra*, at A31. *Cf.* Daniel Okrent, Editorial, *Paper of Record? No Way, No Reason, No Thanks*, N.Y. Times, April 25, 2004, at D4 (stating that the moniker "paper of record" is now "a compliment used as a cudgel," but noting that "[t]he Times once sort of was"). We, however, are not disturbed by the use of "Authority," and refer to the agency by its legal name.

4

of a certain class of subway cars. According to Faiveley, following the termination of the 1993 Agreement, Wabtec continued to use Faiveley's proprietary information to produce BFC TBU for its contract with the Transit Authority. In May 2007, Faiveley submitted a letter to the Transit Authority protesting the Wabtec-Transit Authority contract but did not succeed in having itself substituted for Wabtec.

The 1993 Agreement provided that disputes arising under it would be settled in arbitration proceedings in Stockholm, Sweden. On October 18, 2007, Faiveley filed for such arbitration with the Secretariat of the International Court of Arbitration of the International Chamber of Commerce ("ICC") in Paris, alleging that Wabtec breached the 1993 Agreement by continuing to use plaintiff's trade secrets to manufacture BFC TBU after the 1993 Agreement terminated on December 31, 2005. In those arbitration proceedings, which are ongoing, Faiveley seeks, among other things, damages for breach of the 1993 Agreement and an injunction that prevents Wabtec from producing BFC TBU or the components thereof and prevents Wabtec from disclosing Faiveley's proprietary information to third parties. On the same day that it filed for arbitration, Faiveley filed suit in the United States District Court for the Southern District of New York, seeking a preliminary injunction to prevent Wabtec from manufacturing or marketing BCF TBU or disclosing to third parties any trade secrets associated with BCF TBU pending the outcome of the arbitration.

After a four-day evidentiary hearing, the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) granted Faiveley's application in part and denied it in part. In an August 22, 2008 decision and order, the District Court granted the application insofar as it enjoined Wabtec from (1) "providing [the Transit Authority] with [BFC TBU] manufacturing drawings during the course of the [the Transit Authority] contract," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 572 F. Supp. 2d 400, 409 (S.D.N.Y. 2008) ("*Faiveley II*") (italics omitted), (2) "providing

5

to any third party in some other context those manufacturing drawings or any other materials that contain Faiveley's trade secrets," *id.* at 410 (italics omitted), and (3) "entering into, or bidding for, any new contracts to manufacture, supply, or sell any BFC TBUs, or BFC TBU parts, kits or components until the Arbitral Tribunal renders a final determination on the parties' dispute, and all appeals therefrom have been exhausted or concluded," *id.* (italics omitted). The District Court denied Faiveley's application to enjoin Wabtec from carrying out contracts entered into before the expiration of the 1993 Agreement, *id.*, and, although it enjoined Wabtec from disclosing Faiveley's proprietary information to the Transit Authority, the District Court expressly declined to enjoin Wabtec from using BFC TBU to carry out the Transit Authority contract, *id.* at 409.

Wabtec then filed this appeal.

## DISCUSSION

On appeal, Wabtec contends that (1) Faiveley has not established its standing to assert trade secret claims against Wabtec under the 1993 Agreement, (2) the 1993 Agreement barred Faiveley's resort to the District Court prior to the conclusion of the arbitral proceedings, and (3) the preliminary injunction issued by the District Court is not supported by evidence in the record and, in any event, is overbroad. Only Wabtec's challenge to the contours of the preliminary injunction merits more than brief consideration.

The record provides ample evidence of Faiveley's standing in light of the District Court's findings that (1) Faiveley owned the alleged trade secrets at issue, (2) Wabtec's use or further dissemination of those trade secrets constituted a concrete injury to Faiveley, and (3) any such injury could be redressed by the relief sought by Faiveley. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (describing injury-in-fact, causation, and redressibility as the "irreducible constitutional minimum" of Article III standing); *Pullman Group, LLC v. Prudential Ins. Co., of Am.*, 288 A.D.2d 2, 3 (1st Dep't 2001) (noting that a plaintiff in a trade secret misappropriation case

6

cannot establish standing under New York law unless he can establish that he owned the trade secret).

We also agree with the District Court that the 1993 Agreement did not bar the plaintiff's application for a preliminary injunction. *See Faiveley I*, 522 F. Supp. 2d at 641.[3] Paragraph 27.1 of the 1993 Agreement provides that disputes arising under the agreement are to be "finally settled" in arbitration, but it does not prohibit resort to appropriate forums for preliminary relief in aid of arbitration. In fact, the same paragraph of the 1993 Agreement provides that the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC rules") govern disputes between the parties. In turn, the ICC rules expressly provide that, before the matter "is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, *the parties may apply to any competent judicial authority for interim or conservatory relief*." Rules of Arbitration art. 23(2) (emphasis added). That is precisely what Faiveley did in this case. *See Faiveley I*, 522 F. Supp. 2d at 641-42.

With respect to Wabtec's challenge to the preliminary injunction, we review the District Court's grant of such relief for abuse of discretion. *See, e.g., Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 112 (2d Cir. 2008); *cf. In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ("A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." (internal citations, alterations, and quotation marks omitted)). A party seeking a preliminary injunction must demonstrate: (1) "either (a) a likelihood of success on the

---

[3] Wabtec appealed the District Court's order immediately after it was entered. However, we dismissed the appeal for want of jurisdiction, as the District Court's order—a denial of Wabtec's motion to dismiss Faiveley's petition for preliminary relief—was not a final order within the meaning of 28 U.S.C. § 1291 and was therefore not immediately appealable. *See Wabtec Corp. v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 141 (2d Cir. 2008). We now have jurisdiction to consider the order as part of the District Court's final decision to grant preliminary injunctive relief to Faiveley. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (noting that "[f]ederal appellate jurisdiction generally depends on the existence of a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment" (internal quotation marks omitted)).

merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, " *County of Nassau, NY v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008), and (2) "irreparable harm in the absence of the injunction," *id.*

## A.    Likelihood of Success on the Merits

Faiveley is not entitled to preliminary relief unless it has demonstrated that Wabtec likely misappropriated a trade secret.  Both parties agree that New York law governs that issue in this case. "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999) (applying New York law).

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* at 44 (internal quotation marks and brackets omitted). In determining whether information constitutes a trade secret, New York courts have considered:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993)).

We detect no error in the District Court's conclusion that the BFC TBU manufacturing drawings pertaining to "dimensions and tolerances, surface finishes, material selection and treatments, lubrication specifications, and special instructions for manufacture, testing, and assembly," *Faiveley II*, 572 F. Supp. 2d at 404, contain trade secrets under New York law.  That this

8

information is not widely known is evinced by the fact that no company other than Faiveley—and Wabtec pursuant to the 1993 Agreement—has produced a complete BFC TBU. Faiveley has strictly limited the access of its own employees to the information at issue, and does not permit customers to view it. It is undisputed that SAB Wabco, Faiveley's predecessor-in-interest, devoted substantial resources to the development of the BFC TBU. As demonstrated in the testimony of those who took part in Wabtec's engineering process, BFC TBU and BFC TBU components are extremely difficult to duplicate. The information contained in the manufacturing drawings provided Faiveley, as the District Court found, with "far more tha[n] [a] 'slight competitive edge.'" *Id.* at 405.

Having established that Faiveley "possessed a trade secret," *N. Atl. Instruments, Inc.*, 188 F.3d at 43, we now consider whether Wabtec likely used Faiveley's trade secrets "in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means," *id.* at 44. Wabtec argues that it did not misappropriate Faiveley's trade secrets because it independently discovered the same information through a "reverse engineering" process. As the Supreme Court has noted, "trade secret law . . . does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided its development or manufacture." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974).

In this case, the record provides ample support for the District Court's conclusion that Wabtec's reverse engineering process made "important use of Faiveley's trade secrets," *Faiveley II*, 572 F. Supp. 2d at 408, and was "[a]t a minimum . . . fatally tainted," *id.* at 407, by the involvement of Roland Moore, a Wabtec employee who had "frequent contact with Faiveley drawings during the course of the [1993] Agreement," *id.* at 406. Wabtec's first effort to reverse engineer BFC TBU, which did not involve Moore, produced no usable drawings. However, when Wabtec attempted for a second time to reverse engineer the BFC TBU, Moore was selected to play a key role because "he

9

[was] knowledgeable about the product." Tr. 617:9-10 (Testimony of Paul E. Jamieson, Chief Engineer, Wabtec Corp.). Notwithstanding Moore's "self-serving testimony that his role in the reverse engineering process was minimal," *Faiveley II*, 572 F. Supp. 2d at 407, the record indicates that Moore made several specific recommendations to draftsmen. Wabtec has not presented us with any compelling reason—nor are we aware of any—to question the District Court's assessment that Moore's testimony was "self-serving." *See Joseph v. New York City Bd. of Educ.*, 171 F.3d 87, 93 (2d Cir. 1999) ("Assessments of the credibility of witnesses are peculiarly within the province of the trier of fact and are entitled to considerable deference.").

Accordingly, we hold that the District Court did not err in finding that Faiveley is likely to succeed on the merits of its claim that Wabtec misappropriated Faiveley's trade secrets.

**B.    Irreparable Harm**

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (internal quotation marks omitted). We have explained that "[t]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).

We have previously observed that "the loss of trade secrets cannot be measured in money damages" where that secret, once lost, is "lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (*per curiam*). Some courts in this Circuit have read this passing observation to mean that a presumption of irreparable harm automatically arises upon the

10

determination that a trade secret has been misappropriated. *See, e.g., Ivy Mar Co. v. C.R. Seasons, Ltd.*, 907 F. Supp. 547, 567 (E.D.N.Y. 1995) ("[I]rreparable harm is presumed where a trade secret has been misappropriated."). That reading is not correct. A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge. As Judge Conner has observed, where there is no danger that a misappropriator will disseminate proprietary information, "the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages." *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 966 (S.D.N.Y. 1996) (Conner, J.).

In cases where the presumption applies (and has not been rebutted) or where irreparable injury has been demonstrated, a "narrowly drawn" preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be "narrowly tailored to fit specific legal violations" and to avoid "unnecessary burdens on lawful commercial activity." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994).

Here, the evidence showed that, for over twelve years, Wabtec used what is now Faiveley's proprietary information to manufacture and market BFC TBU and BFC TBU parts pursuant to the 1993 Agreement. Faiveley has not alleged that Wabtec unlawfully disseminated any trade secrets associated with the BFC TBU during that period, nor did the District Court find that Wabtec

11

disclosed the trade secrets to any third party after the 1993 Agreement expired. The evidence also indicated that Wabtec incurred considerable expense in developing BFC TBU so that it would gain a competitive advantage in bidding for contracts like the Transit Authority's subway car overhaul. Disclosure of Faiveley's trade secrets in connection with a contract to sell BFC TBU or BFC TBU parts would only undermine the competitive advantage Wabtec has sought.

Based on this and other evidence, the District Court found that

Wabtec is not disseminating Faiveley's manufacturing drawings or other know-how to any third parties; indeed, *Wabtec* appears to be treating them with the same confidentiality that they give to their own proprietary information, that they gave to Faiveley's proprietary information during the course of the [1993] Agreement, and that they presumably are continuing to give to Faiveley's proprietary information in the context of the so-called grandfathered contracts. . . . *[T]here is no reason to conclude that Faiveley's trade secrets will be "lost forever" absent injunctive relief.*

*Faiveley II*, 572 F. Supp. 2d at 409 (emphasis added). It also concluded that "neither Faiveley nor Wabtec, in the ordinary course of business, pass on manufacturing drawings (which Faiveley claimed in this case were the documents memorializing its trade secrets) to customers like New York City Transit." *Id.* Accordingly, the facts found by the District Court indicate that there is little or no risk that Wabtec will further disclose or otherwise irreparably impair Faiveley's trade secrets.

In light of Favieley's failure to demonstrate, and the District Court's failure to find, that Faiveley would suffer irreparable harm unless Wabtec was enjoined from disseminating its trade secrets, the District Court was without authority (1) to enjoin Wabtec from disclosing Faiveley's trade secrets to the Transit Authority or other third parties "as a precautionary measure," *id.* at 409-10; and (2) to enjoin Wabtec from entering into new contracts to sell BFC TBU or BFC TBU parts, *id.* at 410.[4] The District Court did not point to any evidence in the record, nor can we find any, to

---

[4] We are also concerned that the District Court's preliminary injunction against new sales contracts impinges on lawful commercial activity. *See Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) ("[A]n injunction should not impose unnecessary burdens on lawful activity."). Many of the parts that make up the BFC TBU are in no way associated with Faiveley's trade secrets; they are produced by other companies and are readily available on the market. Although this concern is not the basis for our decision in this case, it may be relevant to any further exploration of the matter on remand.

support the conclusion that Faiveley would suffer irreparable harm unless Wabtec was enjoined from doing what the evidence indicated it was unlikely to do in the absence of an injunction—disseminate or otherwise irreparably impair Faiveley's trade secrets.  In addition, nothing in the record supports the District Court's speculation that new sales contracts would result in an "unacceptably high" risk of dissemination of Faively's trade secrets.  *Id.* at 410.  In the absence of evidentiary support of irreparable harm, there was no basis for the entry of a preliminary injunction against Wabtec in this action.

## CONCLUSION

For the reasons stated above, the August 22, 2008 order of the District Court is VACATED and the cause is REMANDED for further proceedings consistent with this opinion.

No costs.