**A.X.M.S. CORP., Plaintiff,**

v.

**Marvin FRIEDMAN, Joyce Friedman, James Yidan Dong, Sun Lion Investments Limited, and Masterpiece Leather Works, Ltd., Defendants.**

**No. 13 Civ. 1811(KBF).**

United States District Court, S.D. New York.

May 31, 2013.

accorded").

Alan Seth Rabinowitz, Nicholas W. Lobenthal, Teitler & Teitler, New York, NY, for Plaintiff.

Barry J. Friedberg, Leonard Anthony Rodes, Stephen Joseph Arena, Trachtenberg, Rodes, and Friedberg, Virginia Man Leung Tam, White & Case, LLP, New York, NY, Karen Ann Lowell, Law Offices of Karen Lowell, Davie, FL, for Defendants.

*MEMORANDUM DECISION*
*& ORDER*

KATHERINE B. FORREST, District Judge.

In 1993, an American expatriate leatherworker, his Chinese partner, and an American investor supplying seed money began an international trading company based in Hong Kong for the purpose of selling leather goods manufactured by a separate Chinese company also run, in part, by the American leatherworker. The leatherworker, the Chinese partner, and the American investor are now the shareholders, and the directors, of the trading company, which, over the following two decades, developed into a major international leather goods merchant.

Around 2009, Chinese government officials began investigating the manufacturer and the trading company for possible violations of certain pricing issues. The leatherworker and his Chinese partner thus sought to restructure the relationship between the two companies to relieve the attention the Chinese government was giving them. The leatherworker proposed several alternatives for such a restructuring, and the American investor did as well; although the sides could not agree, and have now been stagnant in restructuring negotiations for over three years. In addition, for the past two years, the sides have been unable to agree on appropriate salaries for the leatherworker and the Chinese partner in their capacities as executives of the trading company.

Having failed to come to agreement on these issues—the one concerning the relationship between the trading company and the manufacturer, and the other concerning the salaries of the leatherworker and his Chinese partner—the leatherworker and the Chinese partner have now de-

clared a "deadlock" of the board of directors of the trading company pursuant to the contractual agreement establishing their rights in the company. This declaration required the leatherworker and the Chinese partner to set a price for their ownership interest in the trading company; and they have done so. The American investor was then required to elect whether to buy out his partners, sell his interest in the trading company to his partners, or dissolve the trading company; and he has elected to buy out his partners.

At the same time, the American investor has brought this litigation seeking (1) a declaration that the "deadlock" declared by the leatherworker and the Chinese partner was invalid; and (2) a preliminary injunction preventing the parties from moving forwards with post-deadlock-declaration activities. Now before the Court is plaintiff's motion for preliminary injunctive relief.[1] For the reasons set forth in detail below, that motion is denied. Plaintiff has failed to make a sufficient showing of either irreparable harm nor likelihood of success on the merits.

## I. GENESIS

The following facts are taken from the complaint (ECF No. 1), the documents attached thereto or incorporated by reference therein, testimony from the oral argument and evidentiary hearing on this motion, and the parties' affidavits, declarations, and exhibits submitted. *See Toney–Dick v. Doar,* 12 Civ. 9162, 2013 WL 1314954, at *2 (S.D.N.Y. Mar. 18, 2013);

*City of Newburgh v. Sarna,* 690 F.Supp.2d 136, 141 (S.D.N.Y.2010).

### A. The Parties and Their Companies

Defendant Marvin Friedman was born into a multigenerational American leatherworking family, and has worked in the leather industry for over sixty years. (Friedman Decl. (ECF No. 26) ¶ 5.) After working in the domestic industry until the 1980s, Friedman joined a large, New Jersey-based leatherworking company with operations in Brazil—which were run by Friedman. (*Id.* ¶ 8; Dong Decl. (ECF No. 27) ¶ 4.) Friedman made connections while working in that capacity, and eventually negotiated a joint venture with a Chinese national to open a leather factory in the Chinese village of Zhaoshi. (Friedman Decl. ¶ 9.) Friedman and his wife—defendant Joyce Friedman—moved to China to run the factory, and Friedman eventually hired defendant James Dong as the "liaison" between Friedman's factory and his former company. (*Id.* ¶¶ 10, 11.)

In the early 1990s, Friedman decided to move on from the New Jersey-based leatherworking company and start his own new factory for making high-end leather products in China. (*Id.* ¶ 12.) Thus in 1993, Friedman, his wife, a third American living in Shanghai—Jeannine Bogart—and a Chinese company owned by the Chinese village of Quxiang formed a joint venture Chinese leatherworking company called Changshu Artisan ("Artisan"). Friedman has always received certain percentages of Artisan's earnings as "commission" pay-

---

[1]. As made clear on the record at the oral argument held in this matter on May 9, 2013, currently pending is plaintiff's motion for a preliminary injunction on the deadlock issues described in detail, *infra.* (*See* Tr. of Hr'g of May 9, 2013 ("Oral Arg. Tr.") (ECF No. 39) at 2:21–4:6; 12:14–16; 12:21–24.) Yet plaintiff's reply brief begins with a request for relief neither pleaded nor before the Court on this motion: Plaintiff requests that the Court reform the contractual agreement underlying this case to "WAIV[E]" a requirement that the relevant company's board of directors act only with a quorum present to "PREVENT INTERIM DESTRUCTION OF THE COMPANY." (Pl.'s Reply at 2; *see also id.* at 25.) The Court does not address this last-minute request herein.

ments. Through 2010, Friedman received between five and seven percent of Artisan's profits. (*Id.* ¶ 81.) Since 2010, Friedman has received zero-point-seven percent of Artisan's overseas sales as his commission payments—of which he has shared forty percent with Dong. (*Id.*) Friedman's commission payments have been disclosed in public filings in China since 1994, and were specifically disclosed to Jeffrey Schwarz, the president and owner of plaintiff A.X.M.S. Corp. ("AXMS"), in 1997. (*Id.* ¶¶ 82, 83.)

Around the time he formed Artisan, Friedman also formed another company called Blesson Investment Ltd. ("Blesson") to handle Artisan's international sales— Blesson is now Masterpiece Leather Works, Ltd., defendant in this case. (*Id.* ¶ 15.) Friedman met with an old industry mentor about an investment in Masterpiece, and that mentor introduced Friedman to Schwarz. (*Id.* ¶ 16; *see also* Schwarz Reply Decl. (ECF No. 36) ¶ 1.) Friedman asserts that he believed he was seeking—and obtained—an investment from his old mentor; he asserts that he only learned much later that the entity which eventually invested in Masterpiece was owned by Schwarz. (Friedman Decl. ¶¶ 17, 19.) Schwarz's first investment closed in 1994, at which time the parties signed their original shareholders agreement. (*Id.* ¶ 18.) Pursuant to that agreement, Schwarz owned fifty percent of Masterpiece, while Friedman, his wife, and Bogart together owned the other fifty percent. (*Id.* ¶ 20.)

In 1999, Bogart apparently disappeared. (*Id.* ¶ 34.) Accordingly, Masterpiece removed Bogart from the company—and later Bogart reappeared and sued Masterpiece. (*Id.* ¶ 34.) The parties eventually settled pursuant to an agreement restructuring the parties' ownership interests in Masterpiece. (*Id.* ¶¶ 35, 36.) That agree-

ment—the Amended and Restated Stockholders Agreement (the "Stockholders Agreement"), that is the subject of this litigation—gave AXMS a fifty percent ownership interest in Masterpiece, gave the Friedmans together a twenty-five-point-five percent interest, and transferred the remaining twenty-four-point-five percent interest from Bogart to Dong. (*Id.* ¶ 36; *see also* Complaint ¶¶ 5–8.)

Friedman has been Masterpiece's president, and Dong Masterpiece's vice president of operations since each has been involved in Masterpiece. (Friedman Decl. ¶¶ 22, 23.) Friedman and Dong, however, continued to be employed as well by Artisan; and each's employment agreement with Masterpiece—Friedman's dated as of March 7, 1994, and Dong's as of June 30, 1999—contained a term recognizing that fact. (*See* Friedman Decl. Ex. 4 ¶ 1 ("[Friedman] can devote a potion of [Friedman's] business time to the business of . . . [Artisan] as long as [Artisan is] working exclusively for [Masterpiece]."); Friedman Decl. Ex 5 ¶ 1 ("JAMES [Dong] can devote a portion of JAMES's business time to the business of [Artisan] as long as [Artisan] is working exclusively for [Masterpiece].").) Thus, Dong continued to be the general manager of Artisan, even while the vice president of Masterpiece. (Dong Decl. ¶ 54.) Likewise, Friedman served as the chairman of Artisan, even as he was the president of Masterpiece. (*See* Friedman Decl. ¶ 102.) Moreover, Schwarz has contributed more than just funding to Masterpiece through his company, plaintiff AXMS. For example, Schwarz was, for a period, in "near-daily contact" regarding Masterpiece's operations, and "was instrumental in securing" various major customers. (Schwarz Reply Decl. ¶ 4.)

Although organized under Hong Kong law, Masterpiece is registered for purposes of Hong Kong law as an "offshore compa-

ny"—a company without operations or employees in Hong Kong. (Friedman Decl. ¶¶ 27, 28.) Masterpiece's local administrative and book-keeping functions have been handled by local Hong Kong companies since its inception—the current company handling such functions is called Smartway Trading Co., Ltd. ("Smartway"), a company run by one Perry Ng ("Perry"). (*Id.* ¶¶ 28–30.) The "offshore company" designation allowed Masterpiece to avoid paying substantial amounts of Hong Kong taxes on its profits. (*Id.* ¶ 27.) Artisan, on the other hand, is a Chinese company that sells, in addition to Masterpiece, to several domestic customers. (*See id.* ¶¶ 72–77.)

Masterpiece has been historically successful, and continued to be through the filing of this lawsuit. Its 2012 sales exceed $30 million; and its balance sheet contains $18 million in cash and additional valuable real estate. (Complaint ¶¶ 2, 12.)

### B. The Stockholders Agreement

Masterpiece's Stockholders Agreement governs the relationships among AXMS (*i.e.*, Schwarz), Friedman, and Dong, and is the central document in this case. It sets forth the ownership percentages of Masterpiece indicated above—fifty percent for AXMS, twenty-five-point-five percent for Friedman, and twenty-four-point-five percent for Dong. (Friedman Decl. Ex. 11 ("Stockholders Agreement") § 2.01.) It also sets forth the composition of the company's board of directors—two would be nominees of AXMS, one of Friedman, and one of Dong. (*Id.* § 3.01.) Moreover, each director nominated by any one of the stockholders could be removed from his or her post for any reason by the stockholder who had nominated that director. (*Id.* § 3.02.) In such a case, the nominating-and-later-removing stockholder could, in his sole discretion, fill the vacant spot with a new director of his choosing. (*Id.*)

The board of directors was required to meet at a minimum four times per year. (*Id.* § 3.03.) All four directors had to be present at any meeting in order for the existence of a quorum, which would allow the board to vote on any action. (*Id.* § 3.04.) Directors interested in any transaction or contract contemplated had to be present at meetings for quorum purposes, but such directors were prohibited from voting on the contemplated transactions. (*Id.*)

Should the board of directors become "deadlocked as to a major policy issue," then a so-called "Russian Roulette" deadlock provision would become effective. That provision states:

6.06 *Deadlock Provision.* In the event A.X.M.S., on the one hand, at any time, or Friedman and Dong, on the other hand, determines in good faith that the Board of Directors of the Company is deadlocked as to a major policy issue, including, without limitation, inability to agree on an annual budget or business plan, such that the business or financial condition of the Company could be seriously jeopardized, the party making such a determination may give notice to the other setting forth a cash price for its 50% of the shares.... The party receiving such notice shall have 60 days to determine whether to (a) sell its 50% of the shares ... to the other at that price, (b) purchase the shares ... of the other at that price or (c) cause the dissolution and winding up of the Company. If the party receiving the notice chooses either (a) or (b) in the preceding sentence, the closing of the transaction shall take place with 90 days of its notice setting forth its choice.... If dissolution is chosen, the parties agree to vote at both the Board and Stockholder level in favor of the voluntary dissolution of the Company, at a special meeting of the

Board and the Stockholders to be held as soon thereafter as practicable.... Thereafter, the parties shall, or shall cause the Company to promptly take all actions necessary to dissolve and wind up.

(*Id.* § 6.06.) Thus, breaking the provision into smaller pieces: (1) either AXMS, or Friedman/Dong; (2) could determine that Masterpiece's board of directors was deadlocked; (3) as to a major policy issue—which could include the annual budget; (4) so long as that determination was made in good faith; and (5) so long as the deadlock could place Masterpiece's business or financial condition in jeopardy. In such a case, the block determining that a deadlock exists would set a price for its fifty percent shares of Masterpiece. The other block would then choose whether to (a) purchase the deadlock-determining party's fifty percent of shares; (b) sell its fifty percent of shares to the deadlock-determining party; or (c) cause Masterpiece to dissolve. If the choosing block (*i.e., not* the block that determined that a deadlock exists) decides on dissolution, then *both blocks (i.e., AXMS, Friedman, and Dong)* agreed to vote as both board members and stockholders in favor of dissolution, and to dissolve the company promptly.

This final provision is critical as it relates to other sections of the Stockholders Agreement at issue in this case. Specifically, the Stockholders Agreement provides that "[t]he consent of *all Stockholders* [*i.e.*, not directors] shall be required to approve ... [a]ny liquidation, winding up, dissolution or other cessation of the business of the Company, *except pursuant to*

Section 6.06 of this Agreement." (*Id.* §§ 3.06, 3.06(xv).)[2] And section 6.06 required *all stockholders* to vote in favor of dissolution if dissolution were the result of the Russian Roulette deadlock provision. (*Id.* § 6.06.) Thus, sections 6.06 and 3.06 were coordinated to work in line with one another: The non-deadlock-determining block's decision to dissolve Masterpiece under section 6.06 required both blocks to vote their shares *as stockholders* in favor of dissolution, which required the vote of all stockholders under section 3.06, and which was explicitly contemplated as within the potential allowable outcomes of meetings of the *board of directors.*

Among the items to be considered and voted on by the board of directors was Masterpiece's budget. Pursuant to the Stockholders Agreement, Masterpiece's president—originally, and continuing through today, Friedman—would annually prepare a budget and present that budget to the board. (*Id.* § 3.05; *see also id.* § 3.07(a); Friedman Decl., ¶ 22.) The budget "shall include ... estimated sales, gross margins, costs of sales, ... and salaries of all employees...." (Stockholders Agreement § 3.07(a).) "[C]hanges of twenty percent [ ] or more in any line of the Budget after it is approved for a calendar year [would] require" board approval. (*Id.* § 3.07(b).)

## II. EXODUS

### A. *The Restructuring Issue*

The start of the troubles eventually leading to this litigation occurred in 1997, when Masterpiece purchased a fifty per-

---

**2.** Other actions Masterpiece might have taken that required unanimous approval of all stockholders included "[a]ny sale, lease, exchange, transfer or other disposition, directly or indirectly, in a single transaction or series of related transactions, of all or a substantial part of Company's [sic] or any of its subsidiar-

ies' assets"; and "[a]ny agreement, contract, arrangement or understanding to enter into any transaction of any sort whatsoever with an Affiliate [any entity controlling, or controlled by, a stockholder] ... of a stockholder." (Stockholders Agreement §§ 3.06(ii), (xiv).)

cent ownership share in Artisan. (See Friedman Decl. ¶ 31; Complaint ¶ 13.) Under Chinese law, a corporate entity is deemed a "related party" to another corporate entity if the former owns twenty-five percent, or more, of the shares of the latter—thus, after Masterpiece's purchase of Artisan shares, Masterpiece became a "related party" of Artisan. (Dong Decl. ¶¶ 47, 48.) Due to that status, Dong and others became concerned that the Chinese government would closely scrutinize the prices at which Artisan sold to Masterpiece—known as "transfer pricing"—to investigate possible incidents of tax fraud. (Id. ¶¶ 46, 49–55.) Dong believes that such allegations, if borne out, could lead to civil or criminal penalties for the companies and individuals involved. (See id. ¶ 54.) Indeed, Chinese customs officials investigated Artisan in 2010 and specifically threatened Dong with jail time; and the local Chinese "Tax Bureau" for the region where Artisan's factory was located began investigating whether the companies' transfer pricing was the product of reasonable, arm's length transactions. (See id. ¶¶ 45–46, 49–54.) And moreover, the Quixiang village owners of the fifty percent of Artisan then not owned by Masterpiece separately wrote to Schwarz in 2011 imploring Masterpiece to solve the transfer pricing/tax issues facing Artisan (and Masterpiece). (See id. ¶ 69.)

Dong thus began working on a plan to lessen the possibility of civil and criminal repercussions. (Id. ¶ 55.) Friedman shared this concern. (Friedman Decl. ¶ 102.) Accordingly, Dong developed a proposal to "restructure" Masterpiece and Artisan so that they would no longer be "related parties" under Chinese law. (Dong Decl. ¶ 55.) This would reduce the risk of an audit for transfer pricing issues by Chinese tax authorities. (Id. ¶ 56.) It is in dispute—as argued at length at oral argument on the pending motion held on May 9, 2013—whether Dong's proposals for de-relating Artisan and Masterpiece would have in fact either (a) resulted in the entities no longer being "related parties" for purposes of Chinese law; or (b) in any event caused the Chinese tax officials to have any less interest in the companies.[3] It is, however, undisputed that both blocks—Friedman and Dong on the one hand, and AXMS/Schwarz on the other—have spent considerable time, money, and effort on exploring and understanding the issues involved in the transfer pricing and restructuring dispute, including that both have retained legal and economic professionals to provide expert advice.

From 2010 through 2012, the Masterpiece shareholders negotiated and dis-

---

3. AXMS's expert—a lawyer, accountant, and consultant for foreign businesses operating in China—who testified at oral argument, talked at length about whether Friedman and Dong had retained the correct individuals and firms, and had requested and reviewed the appropriate information, in both determining that the transfer pricing/tax issue represented a serious threat, and attempting to resolve the issue. (See Oral Arg. Tr. at 16–18, 24–26.) However, he had never worked specifically on a matter in which a client was being investigated by Chinese taxation authorities for issues relating to transfer pricing. (Id. at 21:8–14.) Nor had he ever in his career advised clients on the use of corporate restructuring to address "related party" status under Chinese law, or to reduce the risk of investigation by Chinese tax authorities. (Id. at 33:7–16.) Moreover, he admitted that such investigations could result in government action being taken against the company involved. (Id. at 21:15–24.) And he admitted as well that certain rules concerning Chinese transfer pricing issues were nebulous. (Id. at 33:23–35:4, 36:10–14.) Indeed, he agreed with defendants' counsel that "a variety of analyses and processes" should be taken by a company facing such issues and a potential investigation "to ascertain the existence of a transfer pricing risk and perhaps to address it." (Id. at 33:17–22.)

cussed Dong's proposals for "restructuring" Masterpiece and Artisan. (*See id.* ¶¶ 59–62.) Dong's proposal—which was then that Masterpiece's fifty percent ownership interest in Artisan be split among Friedman, Dong, and two separate entities controlled by Schwarz, so that no entity held twenty-five percent of Artisan-was put to a vote of Masterpiece's board on March 28, 2011. (*Id.* ¶¶ 57, 62.) Dong and Friedman voted aye, and AXMS nay. (*Id.* ¶ 62.) Schwarz then made a counterproposal: Schwarz suggested that Masterpiece's entire fifty percent share of Artisan be sold to a British Virgin Islands company to be formed and owned by the Masterpiece shareholders. (*Id.*) Friedman and Dong voted against Schwarz's counterproposal. (*Id.*) Two weeks later in April 2011, Schwarz made a second restructuring proposal—this time outside the context of a board meeting, although again suggesting that Masterpiece's ownership of Artisan be simply transferred to a new company still to be owned by Masterpiece's shareholders. (*See id.* ¶¶ 63–67.) Dong rejected Schwarz's second proposal via email, stating that simply transferring the shares to another company owned still by Masterpiece's owners would not protect against the transfer pricing/tax issues. (*Id.* ¶ 67.)

In early 2012, the Masterpiece board again met to discuss restructuring. (*Id.* ¶ 70.) Dong re-proposed his solution from the March 28, 2011 meeting, and that proposal was rejected by AXMS; AXMS re-proposed its April 2011 solution, and also proposed selling Masterpiece entirely, and both were rejected by Friedman and Dong. (*Id.* ¶¶ 70, 71.) Then at a meeting in July 2012, Dong proposed voting on restructuring again, but Schwarz—as chairman of Masterpiece's board of directors—refused to bring Dong's suggestion to a vote. (*Id.* ¶¶ 72, 73.) The suggestion that Dong made in July 2012—but which apparently was never voted upon—

included changing Artisan's sales practices to increase Artisan's sales to non-Masterpiece customers. (*Id.* ¶ 83.) Thereafter, Dong forwarded to Schwarz communications from Artisan's board requesting that Masterpiece "take a clear position" on restructuring to reduce the transfer pricing/tax audit risks to Artisan. (*Id.* ¶¶ 74, 75.) Schwarz responded by threatening Artisan with legal action if Artisan took actions related to the issue without Masterpiece's consent. (*Id.* ¶ 76.)

AXMS alleges that Friedman and Dong are "interested" in any restructuring of Masterpiece since they receive a percentage of Artisan earnings—currently, together sharing zero-point-seven percent of Artisan's overseas sales. (Complaint ¶ 31; Friedman Decl. ¶ 81.) However, why or how Friedman or Dong was interested in the proposed restructurings is unclear. For example, it is unclear why or how Friedman and Dong were interested in any restructuring of Masterpiece that would simply transfer Masterpiece's fifty percent ownership interest in Artisan to Friedman, Dong, and Schwarz so that none of the three would own more than twenty-five percent of Artisan—it is not explained how such a transaction would affect Artisan's sales to Masterpiece, or to any other party, or affect Artisan's commission payments to Friedman.

Dong's declaration, however, does refer to the suggestion raised in July 2012 to approve a change in Artisan's sales practices such that Artisan's sales to non-Masterpiece customers would be increased. (*See* Dong Decl. ¶¶ 73, 83.) That proposal would have increased the total amount Friedman (and Dong) received as commissions from Masterpiece since sales previously made to Masterpiece could then conceivably be made to other customers at higher prices. (*See id.* ¶¶ 84, 85.) But this specific proposal (a) was apparently

never brought to a vote of the Masterpiece board (*i.e.*, Friedman and Dong never had any opportunity to vote on it, so they never could have recused themselves as interested directors); and (b) is nowhere described or even referred to in AXMS's complaint—which simply states that Friedman and Dong are interested since they receive commission payments from Artisan. (Complaint ¶ 31.)

## B. The Budget Issue

Between 2002 and 2010, Masterpiece's board of directors annually approved the company's budget, which, in accordance with section 3.07(a) of the Stockholders Agreement, included terms for compensation of Friedman and Dong as executives of Masterpiece. (*See* Friedman Decl. ¶ 101.) In 2011 and 2012, however, Friedman presented the Masterpiece board with proposed annual budgets that, *inter alia*, increased the compensation Masterpiece was to pay Friedman and Dong. (*See id.* ¶ 99.) AXMS declined to approve these proposals, and it is undisputed that the Masterpiece board was unable to approve a full annual budget in either 2011 or 2012. (*Id.* ¶¶ 97, 99; *see also* Complaint ¶ 35.) What is in dispute is whether the remainder of the 2011 and 2012 budgets was "approved" and whether Masterpiece has been and is operating pursuant to those budgets, or whether Masterpiece continues to operate pursuant to budgets in place prior to 2010. At oral argument, AXMS's counsel stated that "the company is running," and that the budget was "agreed [to]" in a "very cursory informal way" at Masterpiece's July 2012 board meeting. (Oral Arg. Tr. at 83:6–14; *see also id.* at 84:1–2, 17–19.) Defendants' counsel responded that Masterpiece was operating within twenty percent of the fully-approved 2010 budget, but not operating pursuant to the proposed 2011 or 2012 budgets. (*Id.* at 97:12–98:13.)

Among the issues involved in this area of the parties' dispute is whether approval of a budget required approval of the entire budget as a single document, or could be accomplished through approval of specific items of the budget individually. It is undisputed that the Stockholders Agreement does not specifically provide for approval of individual budgetary items. First, the Stockholders Agreement requires that Masterpiece's president—Friedman—submit a proposed budget to Masterpiece's board annually. (Stockholders Agreement § 3.07(a).) Second, the agreement lists several items that must be included in the budget, without limitation, including "estimated sales, gross margins, costs of sales, operating and administrative expenses, advertising and marketing policy, pricing policy, quality policy, capital expenditures, inventory turnover, financing and borrowing arrangements and *salaries of all employees,* benefits to employees, schedule of new product introduction and diversification plans." (*Id.* (emphasis added).) And the agreement also provides that "[a]ny changes of twenty percent (20%) or more in any line item of the Budget *after it is approved for a calendar year* shall require the approval or consent of the Board of Directors." (*Id.* § 3.07(b) (emphasis added).)

AXMS would have the Court read that third provision as permitting line-item approval of budgetary items when the annual budget is first proposed. But as explained further below, the clear language of sections 3.07(a) and 3.07(b) of the Stockholders Agreement require the president to submit "a" budget, and the board to vote to approve "a" budget; and *after* a budget for a certain year is approved, if some item *in fact* is dramatically more (or less) expensive than was estimated in the budgets, *then* the dramatic increase (or decrease) in the cost of that item must again require

the consent of the board. AXMS alleges that the board did "approve[ ] the 2011–12 budgets save only Friedman's and Dong's request for increases in their compensation as officers of Masterpiece." (Complaint ¶ 35.) Friedman responds simply that the "board was unable to approve an annual Budget for the 2011 and 2012 fiscal/calendar years." (Friedman Decl. ¶ 97.) It is not in dispute that no "entire" budget was approved in 2011 and 2012.

AXMS also alleges that since compensation contracts between Masterpiece and Friedman and Dong were unavoidably contracts between Masterpiece and its stockholders, any such contracts required unanimous stockholder approval under section 3.06(xiv) of the Stockholders Agreement. (Complaint ¶¶ 34, 36.) Section 3.06(xiv) provides that unanimous consent of all stockholders is required for "[a]ny agreement, contract, arrangement or understanding to enter into any transaction of any sort whatsoever *with an Affiliate.*[4] *family member or relative of a Stockholder.*" (Stockholders Agreement § 3.06(xiv) (emphasis added).) Section 3.06(xiv) thus restricts contracts with people who, by definition, *are not* stockholders (although have a certain relationship with a stockholder). In other words, there is no reading of section 3.06(xiv) that restricts contracts with *stockholders themselves*—that section restricts contracts with "Affiliate[s], family member[s] or relative[s] of a Stockholder."

Similarly, AXMS alleges that since the employment contracts at issue contained terms for the salaries of Friedman and Dong—in their capacities as Masterpiece's officers—then Friedman and Dong—in their capacities as Masterpiece's directors—were interested in the contracts and could not vote—as directors—on them. (Complaint ¶ 36.) Friedman and Dong point out, however, that over the nine years between 2002 and 2010, every budget contained terms for their salaries as officers of Masterpiece, and never once did AXMS object to their voting—as directors—on those budgets. (*See* Friedman Decl. ¶ 101.) Indeed, AXMS did not object to Friedman and Dong's voting on even the 2011 or 2012 budgets when those budgets were presented to Masterpiece's board. (*Id.* ¶ 100.)

### C. Fallout

On November 14, 2012, Friedman and Dong together notified AXMS that Masterpiece's board of directors was deadlocked on, *inter alia*, the restructuring issue and the budget issue; and in doing so, Friedman and Dong set a price of $12 million for their fifty percent interest in Masterpiece. (Friedman Decl. ¶ 98; Dong Decl. ¶ 79.) The parties then agreed to several extensions—eventually to March 20, 2013—of the deadline by which AXMS was to elect whether to (a) purchase Friedman and Dong's interests for $12 million, (b) sell its fifty percent interest to Friedman and Dong for $12 million, or (c) cause the dissolution of Masterpiece.

On the day before the deadline was to run—March 19, 2013—AXMS brought the current action, seeking an *ex-parte* temporary restraining order preventing Friedman and Dong from initiating any dissolution of Masterpiece. AXMS's complaint contains two causes of action: (1) for a declaration that any purported deadlock declared by Friedman and Dong is "null and void"; and (2) that defendants breached the Stockholders Agreement by failing to make certain financial records available

---

4. Affiliate is defined as, "with respect to a Person, . . . any *other* Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, such Person." (Stockholders Agreement § 3.06(xiv) (emphasis added).)

to AXMS. [This second issue is not before the Court on this motion, and indeed has already been dealt with pursuant to the Court's discovery orders in the period intervening between the date this action was brought and the date of this Memorandum Decision and Order.]

The Court denied the requested temporary restraining order on March 20, 2013, directed AXMS to make its election by the close of business of that day, and ordered the parties to brief the issues summarized above in the procedural context of a preliminary injunction motion brought by AXMS. (See ECF Nos. 3, 5.) The Court further deemed that any election would be effective as of March 20, 2013, but that no closing on any sale, nor any dissolution efforts or proceedings—nor indeed any material sales of or transactions in Masterpiece's assets—were to occur for the ninety day period prescribed in the Stockholders Agreement (i.e., at the earliest, June 18, 2013). (See ECF No. 3 ¶¶ 2–4.) Thus, if the Court ruled in favor of AXMS on this preliminary injunction motion, then any and all post-deadlock proceedings would be enjoined during the pendency of this action, and there would be no sale or dissolution started on June 18, 2013. And if the Court ruled in favor of defendants, the result of AXMS's election would become (or begin to become) realized on June 18, 2013, and defendants would not have be subject to undue economic uncertainties beyond that time period specifically called for by the Stockholders Agreement—ninety days. AXMS thereafter elected to purchase Friedman and Dong's interests in Masterpiece for $12 million.

## III. LEVITICUS

### A. *Standard of Review on Preliminary Injunction Motions*

■■■ Preliminary injunctive relief is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

*Salinger v. Colting,* 607 F.3d 68, 79 (2d Cir.2010) (quoting *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). The requirements for preliminary injunctive relief are: (1) irreparable harm in the absence of the relief requested; (2) a balance of hardships favoring the plaintiffs; (3) the preliminary injunction being in the public's interest; and (4) either (a) a likelihood of success on the merits, or (b) serious questions going to the merits and the balance of hardships decidedly favoring the plaintiffs. *Toney–Dick,* 2013 WL 1314954, at *9 n. 16 (citing *WPIX, Inc. v. ivi, Inc.,* 765 F.Supp.2d 594, 601 (S.D.N.Y. 2011)): *see also City of New York v. Golden Feather Smoke Shop. Inc.,* 597 F.3d 115, 120 (2d Cir.2010).

■■ The "likelihood of success" element of preliminary injunctive relief requires that plaintiff convince the Court that it is more likely than not—that is a greater than fifty percent chance—that it will succeed on its claims. *See Greenlight Capital, L.P. v. Apple, Inc.,* 13 Civ. 976, 2013 WL 646547, at *4 (S.D.N.Y. Feb. 22, 2013) (citing *BigStar Entm't, Inc. v. Next Big Star, Inc.,* 105 F.Supp.2d 185, 191 (S.D.N.Y.2000)). Moreover, the injury alleged to be irreparable must in fact be that-it must be "actual and imminent, not merely possible," and if the "harm can be remedied in money damages[, that] is the antithesis of irreparable harm, and such a

fact requires that the Court not find an irreparable injury." *Toney–Dick*, 2013 WL 1314954, at *9 (collecting cases).

### B. Applicable Principles of Contract Construction

 "It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms." *Trilegiant Corp. v. Sitel Corp.*, 09 Civ. 6492, 2013 WL 2181193, at *6 (S.D.N.Y. May 20, 2013). The parties' intent is derived "from the plain meaning of the language employed in the agreements," *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir.1999) (quotation marks omitted), when the agreements are "read as a whole." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (1990). Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions." *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir.2010) (quotation marks omitted). Courts must avoid "interpretations that render contract provisions meaningless or superfluous." *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir.2003). When the parties' intent is clear—*i.e.*, unambiguous—the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir.2011) (citing *South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272, 793 N.Y.S.2d 835, 826 N.E.2d 806, 809 (2005)). A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Id.* (citing *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 848 N.Y.S.2d 603, 878 N.E.2d 1019, 1021 (2007)).

 If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous. *See Lockheed Martin Corp.*, 639 F.3d at 69 (contractual language is ambiguous when it "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"). The court must then turn to extrinsic evidence to determine the parties' intent. *State of New York v. Home Indem. Co.*, 66 N.Y.2d 669, 495 N.Y.S.2d 969, 486 N.E.2d 827, 829 (1985) (per curium). While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract. *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008).

## IV. NUMBERS

### A. There Is No Likelihood of Success that Defendants Improperly Declared a Deadlock on the Restructuring Issue

 Pursuant to the plain language of the Stockholders Agreement's deadlock provision, (1) either AXMS on the one hand, or Friedman and Dong on the other; (2) could "determine!] in good faith"; (3) that Masterpiece's board was "deadlocked"; (4) "as to a major policy issue"; (5) "such that the business or financial condition of [Masterpiece] could be seriously jeopardized." (Stockholders Agreement § 6.06.) There is no requirement that the deadlock be causing the immediate disintegration of the company. The requirement is that the deadlock "*could* ... seriously jeopardy[ize]" the company's "business or financial condition." (*Id.* (emphasis added).) Nor is there any requirement—although pressed by plaintiff at oral argument—that the board be deadlocked on a specific proposal placed before it. The requirement is that the board be

deadlocked "as to a major policy issue." (*Id.*) Thus, the parties' entire back-and-forth about which proposals were actually placed before Masterpiece's board, when those proposals were formalized, and whether—as concerns AXMS—Schwarz's suggestions for restructuring Masterpiece were formal proposals placed before Masterpiece's board for vote, or were simply informal statements made in the course of negotiations (*see e.g.*, Oral Arg. Tr. at 77:15–78:14, 79:15–80:18, 81:19–82:6), is irrelevant. The board need not have been deadlocked as to a specific proposal—the Stockholders Agreement requires that it have been deadlocked as to a "major policy issue."

Thus, and reading the Stockholders Agreement pursuant to its plain language, it is clear that the restructuring issue—as an *issue*—could rightly cause a deadlock. The reason for the desired restructuring is not ultimately crucial—a major restructuring of a corporate entity is itself a major policy issue. Here, the fact that an asserted basis for the restructuring is trying to avoid civil or criminal penalties is simply *further* support for it being a major policy issue. Nor can there be any argument that such penalties—and the governmental or regulatory involvement that would come along with them—*could* place Masterpiece's business in jeopardy.

There is also no evidence put forward on this motion, or even any well-pleaded factual allegation, that Friedman and Dong's *determination* that Masterpiece's board was deadlocked was not made in good faith. AXMS would have the Court read the good faith provision to modify, essentially, the final requirement for a deadlock—that Masterpiece be placed in dire straits. Thus, AXMS argues that because AXMS *alleges* that Friedman and Dong did not truly believe that Masterpiece would fail due to the transfer pricing/tax issue, Friedman and Dong could not declare a deadlock on the issue. The Court has no evidence that Friedman or Dong were not acting in good faith, although the Court understands that AXMS is convinced of that fact. In addition however, Friedman and Dong spent considerable time and money consulting professional experts on the financial, accounting, and legal aspects of the transfer price/tax issue. Indeed, so did AXMS and Schwarz; and AXMS's expert himself agreed that "a variety of analyses and processes" was warranted.[5] (*See* Oral Arg. Tr. at 33:17–22.)

This does not end the discussion, however, because AXMS still presents the issue of whether as—or not as—"interested" directors, Friedman and Dong were or are ever entitled to vote on any proposal to restructure Masterpiece. The implication of this issue is that if Friedman and Dong could not vote, then there could not have been a "deadlock" since AXMS would be the only voting party. This issue is a red herring.

First, as discussed above, there is no requirement that the board be deadlocked on a specific proposal on which Friedman and Dong were, or were not, entitled to vote. Instead, the board need only have

---

5. The parties also dispute whether the good faith belief required must be subjective or objective. This dispute matters not to the Court's conclusion—under either standard, AXMS has not convinced the Court that it has a likelihood of success. AXMS has not proffered evidence undermining Dong's assertion that he has been threatened with legal action and jail time; that Chinese tax officials were already investigating Masterpiece's trading partner, Artisan. Moreover, that Friedman, Dong, and AXMS all spent significant resources investigating the transfer pricing/tax issues—and that AXMS's own expert testified that such issues warranted investigation—additionally supports both an objective and a subjective good faith belief in the seriousness of the issue.

been deadlocked as to a "major policy issue"—and to the extent AXMS might argue that Friedman and Dong were precluded from ever even *participating* in negotiations about a major corporate restructuring, (1) that argument is without merit, and is not supported by the Stockholders Agreement; and (2) that argument is belied by AXMS's concession at oral argument that AXMS would support a restructuring proposal that paid out the Masterpiece shareholders in a neutral manner, and indeed that AXMS had presented such a proposal to Friedman and Dong in the past (*i.e.*, a concession that AXMS had, in fact, engaged Friedman and Dong in negotiations about restructuring previously). (*See e.g.*, Oral Arg. Tr. at 73:13–74:6, 78:15–79:14, 80:19–22.)

Second, the restructuring proposals the record shows to have been placed before the Masterpiece board for a vote involved (A) the shareholders of Masterpiece taking Masterpiece's ownership stake in Artisan in accordance with their ownership percentages in Masterpiece; or (B) Masterpiece selling its Artisan shares to a new company to be owned by the shareholders of Masterpiece in accordance with their ownership percentages of Masterpiece. (*See* Dong Decl. ¶¶ 57–62, 70–71.) The board did not agree on either.

It is clear from the record that, as a general matter, the Masterpiece board was grappling with an overall concern involving a major corporate change. Pursuant to the plain language of the Stockholders Agreement, the restructuring issue constituted a "major policy issue." The Court further finds that AXMS has not carried it burden with respect to Friedman and Dong's lack of good faith. The Court also finds that the potential threat of civil or criminal investigations and penalties might have subjected Masterpiece's business or financial condition to jeopardy. Thus,

AXMS has not established a likelihood of success that Friedman and Dong improperly declared a deadlock on the restructuring issue. Accordingly, the Court will not enjoin the deadlock declaration.

**B. There is No Likelihood of Success that Defendants Improperly Declared a Deadlock on the Budget Issue**

 Even if AXMS had established a likelihood of success that the restructuring issue somehow has not properly caused a deadlock—which AXMS has not done—AXMS has failed to establish a likelihood of success that the budget issue is not, itself, a proper basis upon which to declare a deadlock.

The Stockholders Agreement requires that Masterpiece's president—Friedman—submit a budget to Masterpiece's board annually. (Stockholders Agreement § 3.07(a).) It further requires that that budget include a term for the "salaries of all employees." (*Id.*) Friedman and Dong were employees of Masterpiece, and all the budgets from 2002 through 2012 (which, from 2002 through 2010, were all approved at a vote of all Masterpiece's shareholders, including Friedman and Dong), contained terms for their salaries. (Friedman Decl. ¶¶ 22, 23, 100, 101.) There is nothing whatsoever in the Stockholders Agreement, or anywhere in the record, suggesting that *when the budget was put to vote before Masterpiece's board*, specific line-items of the budget would be considered, and voted upon, separately.

It is undisputed that the 2011 and 2012 budgets were not approved in full—AXMS objected both years to Friedman and Dong's salaries contained therein. Such a failure is specifically contemplated in the Stockholder Agreement's deadlock provision. (*See* Stockholders Agreement § 6.06 ("... deadlocked as to a major policy is-

sue, including, without limitation, inability to agree on an annual budget ...").) Nor can it be seriously disputed that the inability to agree on the company's top executives' salaries constitutes a major policy issue possibly threatening the company's business or financial condition. Under the plain language of the Stockholders Agreement, and based on the record before the Court on this motion, Friedman and Dong could—and did—rightly declare Masterpiece's board deadlocked on the budget issue.

AXMS makes three arguments against this result. None are compelling.

First, AXMS argues that the Stockholders Agreement specifically contemplates line-item consideration and approval of budget items. This is not the case. The only reference at all to line-item consideration of anything in a budget is contained in section 3.07(b) of the agreement. And that section only requires that, *"after [a budget] is approved for a calendar year"* Masterpiece's board of directors must consent to a dramatic cost increase or decrease, if that divergence in fact exists for any item on the budget. (Stockholders Agreement § 3.07(b) (emphasis added).) That is not enough. There is no evidence, for instance, that prior budgets were approved in part and became operative in part.

Second, AXMS argues that as representative of employment agreements with Friedman and Dong, the budget lines for their salaries required unanimous stockholder approval under section 3.06(xiv) of the Stockholders Agreement. This argument is unavailing. Section 3.06(xiv) requires unanimous stockholder approval for transactions with "Affiliate[s], family member[s] or relative[s]" of stockholders. (*Id.* § 3.06(xiv).) Obviously, Friedman and Dong are not affiliates, family members, or relatives of themselves.

Third, AXMS argues that Friedman and Dong were precluded from voting on the 2011 and 2012 budgets because they were "interested" in those transactions. Therefore, only AXMS could vote on the budgets, which would not have resulted in a deadlock because AXMS voted against them. This argument has more traction. It is true that Friedman and Dong were interested in their employment agreements and salary arrangements in 2011 and 2012 since they stood to benefit from them whereas AXMS did not. *See Patrick v. Allen,* 355 F.Supp.2d 704, 711 (S.D.N.Y. 2005) (under New York law, a "director is considered interested in a transaction if the director stands to receive 'a direct financial benefit from the transaction which is different from the benefit to shareholders generally'") (quoting *Marx v. Akers,* 88 N.Y.2d 189, 644 N.Y.S.2d 121, 666 N.E.2d 1034, 1042 (1996)).

However, it is also true—for the same reason—that Friedman and Dong were interested in each and every budget voted upon by Masterpiece's board between 2002 and 2012 since each and every budget had terms for their salaries. Yet AXMS never objected to Friedman and Dong voting in any of those board votes, even in 2011 and 2012. Thus, AXMS has relinquished its ability enforce any provision of the Stockholders Agreement preventing Friedman and Dong from voting on budgets which include their own compensation terms pursuant to New York's common law doctrine of waiver. The doctrine of "waiver" provides that "a party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for its benefit" when the counterparty's performance is inconsistent with the contract. *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 383, 388–89 (S.D.N.Y.1999) (alteration omitted). "Waiver of a contractual right may be

established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage and must be based on a clear manifestation of intent to relinquish a contractual protection." *Travelers Cas. & Surety Co. v. Dormitory Auth.–State of New York.*, 735 F.Supp.2d 42, 66 (S.D.N.Y.2010) (internal quotation marks and alteration omitted). AXMS's complete failure to object, over a period of more than a decade, to Friedman and Dong's voting—as directors of Masterpiece—to budgets containing terms for their salaries—as officers of Masterpiece—evinces an intent not to disallow Friedman and Dong from casting such votes.

Permitting Friedman and Dong to vote on budgets including their salary terms logically permits Friedman and Dong's votes—if contrary to AXMS's vote—to cause a deadlock of the Masterpiece board. Such a deadlock would be on a major policy issue—indeed one specifically recognized as such by the Stockholders Agreement—that could place the affairs of Masterpiece in jeopardy. Friedman and Dong could thus have properly declared a deadlock on the budget issue; and they did. Again, at the very least, AXMS has not proven a likelihood of success that Friedman and Dong improperly declared this deadlock. As with the restructuring issue, the Court thus declines to enjoin the deadlock declaration, and AXMS having elected to purchase Friedman and Dong's Masterpiece holdings for $12 million, AXMS must now close on that purchase within the time frame agreed to by the parties

### C. There is No Irreparable Harm

Finally, AXMS has not proven that it will be irreparably harmed in the absence of an injunction of Friedman and Dong's deadlock declaration.

Irreparable harm is the single most important prerequisite to the Court's issuance of preliminary injunctive relief.

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir.2009). The injury alleged to be irreparable must be actual and imminent, not merely possible. *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir.2005). Moreover, the injunction must address the injury alleged to be irreparable—the Court should not grant the injunction if it would not so prevent that injury. *Faiveley,* 559 F.3d at 118 ("We have explained that to satisfy the irreparable harm requirement, plaintiffs must demonstrate that *absent a preliminary injunction they will suffer an injury* that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.") (internal quotation marks and alterations omitted) (emphasis added).

Furthermore, "the fact that an alleged harm can be remedied in money damages is the antithesis of irreparable harm, and such a fact requires that the Court not find an irreparable injury." *Toney–Dick,* 2013 WL 1314954, at *9; *see also Synergy Advanced Pharm., Inc. v. CapeBio, LLC,* 10 Civ. 1736, 2010 WL 2194809, at *4 (S.D.N.Y. June 1, 2010) ("irreparable harm by definition 'cannot be remedied by an award of monetary damages' ") (*quoting Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 97 (2d Cir. 2005); *see also Faiveley,* 559 F.3d at 118 ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.")); *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir.2004) ("If an injury can be appropriately compensated by an award of money damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief."). Thus, "[m]ere injuries, however substantial, in terms of money, time and energy ... are not enough." *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995) (*quoting*

*Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). "Where monetary damages may provide adequate compensation, a preliminary injunction should not issue." *Id.*

 If the injunction in this case issues, then the parties will continue to litigate whether Friedman and Dong's deadlock was properly declared. If the Court concluded eventually that the deadlock was *not* properly declared, then Friedman, Dong, and AXMS will be placed back into Masterpiece as shareholders and directors in what would then be a completely dysfunctional and inoperative situation. If the Court later concluded eventually that the deadlock *was* properly declared, then AXMS would have to close on its purchase of Friedman and Dong's shares of Masterpiece and would own Masterpiece *in toto.*

If the injunction in this case *does not* issue, then, again, AXMS would have to close on its purchase of Friedman and Dong's shares of Masterpiece and would own Masterpiece *in toto.* Presumably, AXMS would seek to amend its complaint to assert claims against Friedman and Dong for breaches fiduciary duty, waste of company assets, breach of contract, and anything else it desired. And it is of course possible that those claims could bear fruit. Indeed, AXMS might be left with a shell of Masterpiece not worth nearly the $12 million it paid for it. But such claims are classic money damages lawsuits. Any damage to Masterpiece created by the actions of Friedman and Dong would be compensable in dollars—and thus the "antithesis of irreparable harm." *Toney–Dick,* 2013 WL 1314954, at *9. Any harm to AXMS—felt through a harm to Masterpiece—is thus also compensable in money damages and therefore cannot support a preliminary injunction.

AXMS makes two arguments why the Court should find that irreparable harm exists. Neither is availing.

 First, AXMS argues that the Stockholders Agreement provides that breaches are not compensable in money damages and therefore requires preliminary injunctive relief *per se.* (Pl.s' Mem. at 22.) The Stockholders Agreement does state:

> Each of the Stockholders acknowledges that the stock of the Company is unique and is not available in the open market, and that this character gives it a peculiar value and that the breach of any of the duties of any of the Stockholders (other than the duty to pay money for shares which they agree to purchase), will result in a loss which cannot reasonably or adequately be compensated in damages in an action at law, and that such breach will cause the Company and the other Stockholders irreparable injury or damage. Each Stockholder expressly agrees that the Company and/or any of the other Stockholders shall be entitled as a matter right [sic] to secure specific performance of the terms of this Agreement and to injunctive or other equitable relief to prevent a breach of this Agreement by such Stockholder.

(Stockholders Agreement § 9.07.) However, it is well settled in the Second Circuit that "contractual language declaring money damages inadequate in the event of a breach *does not* control the question whether preliminary injunctive relief is appropriate." *Baker's Aid v. Hussmann Foodservice Co.,* 830 F.2d 13, 16 (2d Cir. 1987) (emphasis added): *see also Ardis Health, LLC v. Nankivell,* 11 Civ. 5013, 2011 WL 4965172, at *3 (S.D.N.Y. Oct. 19, 2011) ("A conclusory contract provision alone cannot establish irreparable harm.... [T]he Court must perform a standard inquiry into the existence of irreparable injury and simply use the contractual provision as one factor in its assessment."); *Life Techs. Corp. v. AB Sciex*

*Pte. Ltd.*, 11 Civ. 325, 2011 WL 1419612, at *5 (S.D.N.Y. Apr. 11, 2011) (contractual language providing for *per se* irreparable harm is "merely one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue, and a plaintiff cannot rely on the contract provision alone to demonstrate irreparable harm"). Here, as discussed *supra*, the facts alleged do not support the existence of irreparable harm, and therefore section 9.07 of the Stockholders Agreement cannot create it.

Second, AXMS argues that courts "find irreparable harm from loss of control of a business or management right regardless of monetary damages." (Pl.'s Mem. at 22.) But in this case, it is *the injunction* that could lead to the loss of business control-or at the very least would lead to a business situation in which no party could exercise meaningful control and the business would be, in the literal sense, deadlocked. Absent the injunction, AXMS will be *fully in control* of Masterpiece.[6]

## V. DEUTERONOMY

For the reasons stated above, AXMS has failed to prove that it has a likelihood of success—or indeed that there even exist serious questions going to this case's merits—on its claim for a declaration from the Court that defendants have improperly caused a deadlock. Nor has AXMS proven that without a preliminary injunction it will be irreparably harms. Accordingly,

AXMS's motion for a preliminary injunction is denied.

Defendants shall be entitled to begin any actions or procedures otherwise restricted by the Court pending this decision beginning on the second business day following the date of this decision—*i.e.*, June 4, 2013—as contemplated by paragraph three of the Court's March 20, 2013 Order. (*See* ECF No. 3 ¶ 3.)

SO ORDERED.

---

**6.** Indeed, since the Court is not preliminarily enjoining the deadlock declaration, and if AXMS closes on its purchase of Friedman and Dong's interests in Masterpiece, then AXMS will be in complete control of Masterpiece without interference from its current co-directors. For the past several months however, Schwarz, in his position as chairman of Masterpiece's board, has noticed numerous board meetings, some of which were never held, and others of which were held but without advancement on any of the issues discussed in this Memorandum Decision and

Order. (*See e.g.*, Friedman Decl. ¶¶ 88–96; *see also generally* Rodes Decl. (ECF No. 28) Ex. C (containing or referring to notices of proposed board meetings for December 27, 2012, January 28, 2013, January 29, 2013, February 7, 2013, and March 14, 2013).) This fact alone is representative of the total, functional deadlock of Masterpiece's board, and is further support for the Court's prior conclusions that AXMS has not established a likelihood that Friedman and Dong improperly declared a deadlock of Masterpiece's board.